**Johnny Dean PYLES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69091.**

Court of Criminal Appeals of Texas, En Banc.

June 1, 1988.

Richard Kristin Weaver, on appeal only, Richard Alan Anderson, on appeal only, Dallas, for appellant.

Henry Wade, Dist. Atty. and John D. Nation, Gerry Banks, Rider Scott, Winfield Scott & Donald Land, Asst. Dist. Attys.,

Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder. See V.T.C.A., Penal Code Sec. 19.-02(a)(1). After the jury made affirmative answers to the three special issues submitted under Art. 37.071, V.A.C.C.P., the trial court imposed the penalty of death by lethal injection. This case is before us on direct appeal.

The appellant presents us with fifteen points of error. A review of the facts is necessary.

During the early morning hours of June 20, 1982, Dallas County Sheriff's officer Ray Kovar was shot to death while investigating a suspected burglary. Kovar and his partner, Dwaine Crain, arrived at Landers Grocery Store in response to a call for a backup from Officer Charles Mitchell. The time was approximately 1:00 a.m. After Kovar and Crain secured the building, the three officers began a search of the area.

Mitchell saw Kovar walk around the east side of the building, with a flashlight in his left hand and his pistol in his right hand. Crain took a shotgun and went to the west side of the building to search there. Mitchell and Crain both heard Kovar tell someone, "Halt, get up." Then a series of gunshots were fired. Mitchell ran to help Kovar, and found Kovar lying face down.

Crain heard Mitchell shout that Kovar was down. Crain called in a report on his radio, of an officer being down, to his dispatcher before joining Mitchell. Crain noticed that Kovar's flashlight was turned on. Crain watched two Mesquite Police Officers unsuccessfully attempt to resuscitate Kovar, who had a gunshot wound to the chest. Crain believed that Kovar was dead at the scene. Several officers searched the scene of the shooting, but they were unable to locate a suspect.

Richard Hart was a reserve deputy sheriff who was called out to assist in the search for the person who killed Officer Kovar. He set up surveillance in an unmarked car almost two miles from the scene of the shooting. Around 4:00 a.m., Hart saw a white male, the appellant, walking toward him on Collins Road. He immediately radioed a description of the man to the dispatcher (muddy and torn clothing), and then left the car, pointing his flashlight and pistol at the appellant and ordering him to halt. At first, the appellant turned around and took several steps back the way he came. Hart again ordered appellant to stop, saying, "One more step and that's it." Appellant turned around and raised his hands. He told Hart that he was not armed. Hart ordered the appellant to lie face down on the road. He noticed that appellant's right hand was swollen, and that the appellant was bloody and covered with mud. Hart handcuffed the appellant and placed him in the back seat of the car so that appellant was lying face down. Hart recited the appellant's *Miranda* warnings to him on the way to the Sunnyvale Substation. The appellant indicated that he understood his rights. At the substation, Hart turned his prisoner over to Lieutenant Walter Potts, who took charge of the investigation.

Tom Boardman was a Dallas County Night Magistrate at the time of the shooting. At 4:00 a.m. he was called and requested to go to the Sunnyvale Substation. Upon arrival, Boardman noticed that the area was crowded with automobiles and police officers. Boardman found the appellant in the library. To the magistrate, the appellant was disheveled and looked like he'd been "run through a couple of barbed wire fences." The appellant told Boardman his name and date of birth. Boardman then gave the appellant his Miranda warnings. He advised the appellant that he was being charged with capital murder, which was punishable by life imprisonment or death.

The magistrate asked the appellant if he was in pain and if he wanted to go to the hospital. The appellant did not ask for medical attention and did not complain of

being in pain. Boardman observed a paramedic take the appellant's blood pressure, then bandage the appellant's hand and elevate his arm. Boardman asked the appellant if he was up to talking to the police. The appellant responded affirmatively and Boardman left for a brief period.

Boardman returned to witness the signing of a statement by the appellant. He informed the appellant that he did not have to sign the statement. According to Boardman, the appellant replied, "I might as well, Judge. I did it." The appellant then signed the statement with his left hand. This was the appellant's first signed statement, which was admitted into evidence as State's Exhibit No. 44.

Afterward, Sergeant Larry Williams of the Dallas County Sheriff's Office, interrogated the appellant. A second statement was prepared based on the conversation between appellant and Sergeant Williams. Appellant signed this statement, which was admitted into evidence as State's Exhibit No. 46.

The medical examiner testified that the cause of death of Officer Kovar was a gunshot wound to his chest. A .38 calibre bullet was removed from the body of the deceased. An officer from the Physical Evidence Section of the Sheriff's Office testified about the scene of the shooting. He explained that a .357 magnum pistol was found where Officer Kovar fell. There were six fired hulls in the weapon. A .38 calibre pistol, found twenty-seven feet from Officer Kovar, contained four fired hulls and one empty chamber. Both weapons had been completely emptied by firing.

The appellant testified in his own behalf, explaining that he was not aware at the time of the shooting that the deceased was a police officer. Appellant claimed that he acted in self-defense, after he saw a flashlight and a gun pointing at him and after he heard a voice telling him to "halt," when he began exchanging gunfire with the deceased.

We will affirm the conviction.

In his sixth point of error, the appellant argues that the trial court erred when it failed to make findings of fact and conclusions of law concerning the admissibility of the appellant's two confessions. This Court granted the State's motion to supplement the record with the findings of fact and conclusions of law, which were filed with the Clerk of this Court on March 26, 1986. This point of error is now moot.

In his tenth point of error, the appellant argues that the trial court erred when it failed to sustain his challenges for cause to venireperson W.P. Ricamore. Appellant states that Ricamore was unable to consider the full range of punishment for the offense appellant was charged with. This argument results from an answer by Ricamore during voir dire that he could not consider the minimum punishment of five years unless the accused was convicted of committing an accidental murder. The State concedes that Ricamore made those statements early during his voir dire, but argues that Ricamore was rehabilitated so that he could consider the full range of punishment.

■ To assess a prospective juror's capacity to consider the full range of punishment, we must examine the juror's testimony as a whole. *Pierce v. State,* 604 S.W.2d 185 (Tex.Cr.App.1980); *Cuevas v. State,* 575 S.W.2d 543 (Tex.Cr.App.1978); *Vigneault v. State,* 600 S.W.2d 318 (Tex.Cr.App.1980); and *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981).

In reviewing the testimony of the venireperson, we must determine if Ricamore's view of the range of punishment amounted to a bias or prejudice against the law. See Art. 35.16(b)(3) and (c)(2), V.A.C.C.P. The following exchanges and statements occurred during the voir dire of Ricamore:

"Q. (State's Counsel): You know, it might be a one-in-a-hundred case or a one-in-a-thousand case, but if it came down the pipe and you saw that case and you said to yourself, 'This is a proper case with the proper set of facts and it's the proper defendant. I think it's proper in this case I could vote a five-year sentence, the minimum sentence', could you do it?

A. Yes.

Q. Or a ten or a fifteen?

A. Whatever it warrants.

Q. Or an eighty or a ninety or whatever it warrants? Are you with me there on how we're talking about open mindedness?

A. Yes.

Q. Do you have any problem with that?

A. No."

Later, the attorney for the appellant asked more questions regarding Ricamore's impression of the range of punishment.

"Q. (Defense Counsel): I'll not go through the whole question again with you, but I think you see what I'm asking. Having found the Defendant guilty of the offense of murder for the voluntary, intentional killing of a Deputy Sheriff but having a reasonable doubt or believing the State has failed to prove that the Defendant at the time of the shooting knew the deceased was a Deputy Sheriff, could you in the proper case and under the proper circumstances after hearing all the facts brought out by either side consider and give a sentence of the minimum five years in the Texas Department of Corrections if you believed it to be the proper thing to do?

\*　\*　\*　\*　\*　\*

A. No. If it's murder, I think he should have more than five years period.

\*　\*　\*　\*　\*　\*

Q. (Defense Counsel): Also in a murder case having found the defendant guilty of murder could you, after taking all the facts and circumstances into consideration and if you thought it proper, could you in the proper case consider and give the minimum of five years in the Texas Department of Corrections?

A. No."

The State then attempted to question Ricamore further on the range of punishment. After the State's attorney began the attempt at rehabilitation, Ricamore made the following statement:

"A. When you explained it before it wasn't that somebody pulled a gun on a man but now we know that the gun has been pulled and the man has been killed and that's murder and I say five years is too little; I really mean that."

Ricamore then stated under what condition he would consider the minimum range of punishment.

"A. All right. If the case presented itself as such and the man had not say used force with a gun or murdered such like that, yes, I could see. If it was an accidental murder, sure, I could go along with five years; it would be fine."

The State immediately confronted Ricamore about this statement.

"Q. (State's Attorney): When I define 'murder' to you, I said it was not an accident, it wasn't self-defense because a murder is a knowing and intentional taking of human life without an excuse or without justification. Justification is self-defense. Accident is an excuse. That's not murder. It's going to have to be a killing. But there are all kinds of things that go into one person taking another person's life. The legislature says that there are enough of those things that go into it that you have to have a broad range of punishment. They further go on to say that before you can take a seat over here in the jury box you as a citizen to give anybody that takes a life in Dallas County, you have to be open minded enough to consider the full range of punishment. That doesn't mean that you have to give five years in every murder case. It means that you have to be able to consider it and if you thought it was proper you could give it.

A. That's true.

Q. Now, can you do that?

A. If the facts present itself or I thought there might be a possibility of a five-year sentence, yes, I could go along with that.

\*　\*　\*　\*　\*　\*

Q. (State's Attorney): You know, I could get up here and say, 'Well, Mr. Ricamore, would you ever give a five-year sentence to somebody that gunned

down twelve school children?' Well, obviously with that image in your mind you're going to say no all day long and you'd never be qualified as a juror. That's not the test. The test is although there's a taking of life, a knowing and intentional taking of life, that you're open minded, you can follow the law, you can follow the charges of the court, you can follow your oath as a juror and you can consider the full range of punishment. If it calls for five and you think it's proper, you'd do it. Just like if it's proper to give life you could consider it and do that. Now that's all we're asking.

A. All right, sir.

Q. Can you do that?

A. Yes.

Q. Now, is there any confusion about that issue?

A. Not if I'm to judge just the facts that are proven.

Q. That's all you're to judge. And the law goes further, Judge Chapman tells you in his charge that you're to consider the full range of punishment and you do what you think is proper. You see, I don't want to go in and try to influence you at this time to tell you it ought to be this number of years or this number of years or this number of years. None of the lawyers out here are supposed to do that. The only thing they're supposed to ask you, Mr. Ricamore, is: If it's a proper case and you think it's the proper penalty you could give the minimum or you could give the maximum or your could give anywhere in between.

A. If you put it that way, yes.

Q. Can you do that?

A. Yes.

\* \* \* \* \* \*

Q. (State's Attorney): Do you have an open mind to the entire range of punishment in a murder case?

A. Yes.

Q. And in a proper case you could give five, you could give life or anywhere in between where you thought the proper verdict should be?

A. Right.

Q. Any problem with that?

A. None.

Q. Any confusion about it?

A. None.

Q. Do you have anything you want to ask me that I have not totally explained to you at this time?

A. No.

Q. You understand that's just as fundamental as being able to presume the defendant innocent; you have to give him a fair trial to the whole range of punishment before you can be qualified to sit up there in that jury box?

A. Until he's proven guilty.

Q. That's right. And after you find him guilty you've got to give him a fair shake on the entire range of punishment, not close your mind. Can you do that?

A. Yes."

The trial court then took Ricamore on voir dire to determine if the venireperson could fairly consider the full range of punishment.

"THE COURT: I heard you reply to Mr. Wilson's questions in a way that I thought you were telling me that for a knowing and intentional killing your mind would be closed on this issue of a five-year sentence, that you would never consider it proper. Then in Mr. Scott's questions you indicated that you do have the open mind required of a juror in that if the proper set of facts and circumstances were demonstrated to you, you could certainly consider and assess a five-year sentence. I think what you may be saying is you might be reluctant or it might be—There might in some way be one out of a great number of cases in which that might be warranted but that you're satisfied in your own mind that if the facts and circumstances indicated to you that a five-year sentence was proper you could consider and assess it?

MR. RICAMORE: Yes.

THE COURT: Now, the law certainly has no quarrel with your feeling with the offense of murder that usually the punishment ought to be severe and have no quarrel with you from wanting to be

extremely cautious and careful before ever fairly considering and assessing a low sentence such as a five-year sentence, just as on the other hand you should certainly be careful and cautious before ever assessing a high number of years in a sentence or a death penalty. And like I say, that's certainly all right.

The word 'consider' is really looked upon as meaning fairly consider, and if you can tell me in your own mind that if you heard the set of facts and circumstances that convicted you it was proper you could give it fair consideration and if you thought it was proper you could assess it. Is that what you're saying?

MR. RICAMORE: That's what I'm trying to say, Your Honor, is the way the two presented it down here, one had the gun and the other didn't have, yet the various deals on the sentence, but if the facts warrant it I could give the extreme or if the facts warrant it I could give the minimum.

THE COURT: All murders, you understand, in your own mind, before you ever get to the point of considering the issue of punishment you have found the person guilty of knowingly and intentionally taking another person's life, you understand that?

MR. RICAMORE: Yes.

THE COURT: And then I take it any sentence you might have to assess thereafter depend upon the facts proven to you?

MR. RICAMORE: That's right.

THE COURT: And if the facts warrant in your mind a five-year sentence you could consider and assess it, is that right?

MR. RICAMORE: That's right.

THE COURT: And if it warranted a life sentence you could give it?

MR. RICAMORE: I could do that.

THE COURT: I find the juror qualified."

■ The venireperson Ricamore admitted his conscientious scruple against assessing a minimum punishment in the case of murder. V.T.C.A., Penal Code Sec. 19.-02. At first, he said he could only consider it in a case of "accidental" murder. When the State's attorney questioned Ricamore further, the venireperson stated he could responsibly judge the facts proven at trial, and assess punishment within the full range available. During his personal questioning of Ricamore, the trial court acknowledged that Ricamore would be cautious in assessing the minimum punishment. But Ricamore told the judge he could set aside his caution and comply with his oath and follow instructions.

Great deference is to be given to the decision of the trial court who has broad discretion in ruling on a challenge for cause, because the trial court is present to observe the venireperson, including the demeanor and tenor of voice of the venireperson. *Bird v. State*, 692 S.W.2d 65 (Tex.Cr. App.1985) cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986); *Ex parte Russell*, 720 S.W.2d 477 (Tex.Cr.App.1986). We find there is support in the record that Ricamore's belief would not amount to a bias or prejudice against the law. Art. 35.16(b)(3) and (c)(2), supra. The tenth point of error is overruled.

■ In points of error eleven, twelve, thirteen and fourteen, the appellant claims it was error for the trial court to excuse four prospective jurors, sua sponte. In each point of error, the appellant argues that the prospective juror did not qualify for a challenge for cause. The appellant charges that the trial court's sua sponte excusal of these four prospective jurors effectively resulted in the State being granted extra peremptory challenges, to the disadvantage of the appellant.

The four prospective jurors were Judith Blevins, Alice Berensee, Mary Holloway, and George Tucker. Appellant claims that each of these four were sua sponte excused by the Court. Relying on *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980), appellant argues the trial court erred because these four jurors were not "absolutely disqualified" under Art. 35.19, 35.-16(a)(2), (3) or (4), V.A.C.C.P. We find that the appellant is mistaken about the evidence before us in the instant case.

Each of the four jurors was excused upon a state challenge for cause. The record before us contains the trial court's master list of jury strikes. This list indicates the trial court excused Blevins, Berensee, Holloway and Tucker on the State's challenges for cause.[1] Because these four jurors were not sua sponte excused by the trial court, there is no foundation for the appellant's four points of error. Points of error eleven, twelve, thirteen and fourteen are overruled.

In his first point of error, the appellant alleges that the trial court erred when it admitted into evidence during the guilt adjudication phase of his trial his first confession, which appellant states was involuntary and the fruit of an illegal arrest.

The trial court held a pre-trial hearing to determine if the appellant's motion to suppress the confession should be granted. At that hearing, Deputy Hart testified about his decision to arrest the appellant when he saw him that morning on Collins Road.

Hart explained that the police had formed a "horseshoe" around the area where the killing occurred, with both ends of the shoe at Lake Hubbard. The area was "pretty well blocked off with manpower." As a participant in this blockade, Hart was aware that a fellow officer had been killed and that the murderer was still at large. A superior in the Sheriff's Office assigned Hart and his partner to set up surveillance at the intersection of Collins and Tripp road in a residential neighborhood.

While on surveillance, around 4:00 a.m., Hart said that he "saw a white male with a white T-shirt and blue jeans coming out on Collins toward Tripp across the road from where we were." Hart, who was sitting on the passenger side of his unmarked police car, immediately radioed his dispatcher that he "had a white male walking towards us whose clothing was muddy and torn."[2] As soon as he got off the radio, Hart left his car. He had his flashlight out and turned on, shining in the man's face. Hart also

---

1. We note that different counsel represented the appellant on this appeal. Perhaps the appellate counsel was confused by some of the language in the record.

   When the state's attorney finished his voir dire of Berensee, he stated to the trial court, "I will submit the juror, your Honor." After his voir dire of Holloway, he said to the trial court, "Your Honor, we pass and submit the juror." At the conclusion of his voir dire of Tucker, he told the trial court, "And with that we pass the juror and I submit the juror."

   The trial court understood the term "submit" to mean that the attorney was challenging the jurors for cause. The trial court indicated this by his entries on his master list. We recognize this record's representation of the voir dire in the instant case.

   However, we note this is not the first time that the confusing use of the phrase "submit the juror" during selection of a jury has come before this Court. In *Grider v. State*, 468 S.W.2d 393 (Tex.Cr.App.1971), this Court commented on the fact that a prosecutor usually did not make a formal challenge for cause. Instead, he said, "We submit the juror." This Court remarked that the record did not indicate if this was the customary practice in Dallas County. *Grider*, at 398. In *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976), cert. denied 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), this Court observed the same practice in use in Dallas County. We stated that, "If there is such a custom, the appellate record should so reflect, *Moore, supra*, n. 3 at 670. More recently, in

*Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App. 1986), this Court again faced a confusing record. We had difficulty discerning the State's specific grounds for its challenges for cause because the State again requested excusal of jurors by saying merely, "we submit," *Mann, supra*, n. 6 at 746.

*Grider, Moore,* and *Mann* share a common feature with the instant case. They were all tried in Dallas County. From 1971 to the present, there appears to have been little, if any, concern for these suggestions. But there is as great a need for specificity in voir dire today as there was seventeen years ago. (Even in Dallas County).

A problem arises from the condoning of this practice by a trial court. Attorneys will look for a better short cut. This happened with the fourth prospective juror, Blevins, where there was no use of the "magic" words "we submit the juror." The attorney only said, "We'd pass the juror. We thank you very much, Mrs. Blevins." Though this might appear on first reading to mean the State accepted the juror, the appellant's trial counsel recognized a different meaning. When he finished his voir dire of Blevins, he told the trial court, "we'll object to excusing her as to cause." Obviously, the trial court recognized the same thing, because he recorded that Blevins was excused on a state challenge for cause.

2. At trial, Hart stated that the appellant had both blood and mud on him.

had his gun out, pointing at the man who he identified at trial as the appellant. He yelled, "Freeze, police."

As soon as Hart spoke to the appellant, he "turned away from me and started—took several steps away from me." Hart recalled he then started "running towards him and I again hollered at him to halt and at which time he brought his hands up slowly, turned around and said, 'I'm not armed.'" The next thing Hart said was "down face down lying on the ground." Hart said, "I had my gun in the back of his head, held him there and I yelled for my partner to radio that we had a good suspect. I told him if he moved I would blow his head off."

On cross-examination, Hart filled in some of the details of what led him to arrest the appellant. When asked if he'd been given a general description of the subject, Hart replied, "No, sir. I had no idea ... All I knew an officer had been shot and that was it." When he had the appellant face down in the street, Hart asked him where his partner was. The appellant replied that he was alone. Hart then asked him where his gun was, and the appellant said, "I don't know." Hart stated the appellant appeared to be "physically exhausted, tired, or out of breath." Hart's partner then asked the appellant where his jeep was, and appellant responded that he did not know.

Hart was then asked by counsel for appellant if he had any information about a jeep at the scene of the murder.

"A. (Hart): All I knew—all the information I picked up was simply listening to the radio transmissions. One of the squads—one of the CID squads was tracking down—there had been a vehicle —I don't remember it—they said jeep I believe. They had a license on it. They were trying to run down the owner. I think they were heading towards Irving or whatever. That's all I knew.

Q. (Defense counsel): Why were you of the opinion (that he had located the suspect)?

A. His physical appearance. He had been—for some reason or another he had

either, in my opinion, he had been through brush, a fence or something enough to—I thought he had just cut his hand. I did not realize what had happened. I thought he had been cut. His clothing was torn. The time of day. His response to my questions.

\* \* \* \* \* \*

Q. (Defense counsel): You had no information on a description of the culprit or how many there were or type of vehicle or the exact location.

A. No, sir."

After the appellant was handcuffed and placed in the back seat of a police car, Hart rode with him back to the Sunnyvale Station. On the way, Hart read the appellant his rights. When he finished, Hart asked the appellant if he understood the rights as they were read to him. The appellant said yes.

From the record, it appears that Hart did not have a warrant for the arrest of the appellant. He also did not have a general description of a suspect. All he knew was that an officer was dead and the suspect was still at large in the vicinity. We must determine if the warrantless arrest of the appellant was appropriate under the facts.

The appellant complains that his arrest was unjustified because he committed no offense in the presence of Deputy Hart. Appellant also complains that Hart made no attempt to question him as to his activities prior to making the arrest. On this point of error, appellant relies on the provisions of Art. 14.04, V.A.C.C.P.:

Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest accused.

The State responds by arguing that Deputy Hart had, within his knowledge, sufficient information to conclude that the appellant was a likely suspect, and that he was attempting to escape from the scene of the crime.

In his findings of fact and conclusions of law, the trial court found that "the initial arrest of the defendant by Deputy Hart was based on probable cause." The trial court cited *Brown v. State*, 481 S.W.2d 106, 110 (Tex.Cr.App.1972) in support of this conclusion.

■ The constitutional validity of a warrantless arrest or search can only be decided in terms of the concrete factual situation presented by each individual case. *Brown, supra.* In the instant case, probable cause would exist if, at the moment of arrest, the facts and circumstances within the knowledge of Deputy Hart and of which he had reasonably trustworthy information would warrant a reasonable and prudent person in believing that appellant had committed the murder of Deputy Kovar. *Brown, supra; Britton v. State*, 578 S.W.2d 685 (Tex.Cr.App.1979); and *Earley v. State*, 635 S.W.2d 528 (Tex.Cr.App.1982). In addition, we must also determine if that reasonable and prudent person would be justified in believing the appellant would "take flight if not placed in custody, and whether the conduct of Deputy Hart himself unnecessarily created the likelihood of such an action by appellant." See *West v. State*, 720 S.W.2d 511 (Tex.Cr.App.1986).

In assessing whether Deputy Hart had sufficient knowledge, we are not limited to considering only his personal knowledge. "It is well established that an officer who does not himself possess probable cause for making a warrantless arrest may act upon the basis of information relayed to him by another officer requesting that an arrest be made." *Tarpley v. State*, 565 S.W.2d 525 (Tex.Cr.App.1978). "When there has been some cooperation between law enforcement agencies or between members of the same agency, the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved is to be considered in determining whether there was sufficient probable cause." *Woodward v. State*, 668 S.W.2d 337 (Tex. Cr.App.1982); cert. denied 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952; *Garrison v. State*, 726 S.W.2d 134 (Tex.Cr.App.1987).

■ There are several factors which can help to indicate that a suspect may be committing, or have just committed, an offense, or that the suspect may be attempting to escape from the commission of the offense. These factors include furtive movements and gestures, *Smith v. State*, 542 S.W.2d 420 (Tex.Cr.App.1976), flight at the approach of strangers or law officers, *Muniz v. State*, 672 S.W.2d 804 (Tex.Cr. App.1984), the place where a suspect is found and the direction in which he is traveling, *Woodward, supra*, and being on a public street instead of in a private residence, *Hardison v. State*, 597 S.W.2d 355 (Tex.Cr.App.1980). These factors are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of the crime, are properly considered in the decision to make an arrest. *Smith, supra;* and *Muniz, supra.* When taken alone and by themselves, these factors may be as insufficient for this purpose as an inarticulate hunch on the part of the arresting officer. *Smith, supra.*

In each case, it is the *combination* of the knowledge of the arresting officer and other cooperating officers, the observations of the arresting officer, and the factors that indicate the commission of a crime and an attempt to escape therefrom which constitute a reasonable conclusion that there is probable cause to make an arrest without a warrant.

■ In the instant case, the appellant was effectively under arrest when Deputy Hart made him lie face down in the street. At that moment, Deputy Hart was aware of the following:

1. A Dallas County Deputy Sheriff had been killed, and the suspect was still at large in the area that Hart helped seal off. The suspect, or suspects, may have abandoned their jeep at the scene of the crime.

2. The appellant's physical condition at the time of his arrest. He was muddy, had blood smeared on him and his clothing was torn.

3. When confronted by Deputy Hart, a uniformed officer, the appellant's first reaction was to turn around and attempt to walk away. Deputy Hart had to order the appellant a second time to stop. After the second warning, appellant made no more furtive gestures or movements.

4. The appellant was found in a residential neighborhood at 4:00 a.m. traveling on foot.

5. The appellant was arrested on a public street, leaving the area which had been cordoned off to find Deputy Kovar's murderer.

From this, a reasonable and prudent person could conclude, as Deputy Hart did, that this white male, who was walking alone in a residential neighborhood at 4:00 in the morning, was muddy, had blood all over him and his clothing was torn, who attempted to flee from a uniformed officer, was involved in the murder of Deputy Kovar and was attempting to escape from the commission of that offense. Though warrantless, we hold that the arrest of the appellant was justified under the rule of Article 14.04, V.A.C.C.P. The appellant's confessions were not tainted by this arrest.

This does not end the discussion on point of error number one. Appellant also argues that his first confession is inadmissible because it was involuntarily given by him to the authorities. Appellant asserts that his first confession was taken from him while he was in a debilitated and helpless condition. In support of this argument, the appellant asserts that the "uncontroverted facts" indicate that he was in physical shock at the time that he confessed. We disagree with the appellant's assessment of the facts on this matter, as did the trial court.

In his findings of fact and conclusions of law, the trial court included the following on the matter of the appellant's physical condition at the time of his first confession:

"8) Boardman had noticed Defendant's condition on his arrival at the substation. Boardman asked Defendant how he felt and if he were up to talking with Lieutenant Potts. Defendant said that he was. At this time, Defendant seemed to be in control of himself; his attention was complete and his answers were appropriate.

"9) Teddy 'Mike' Jones, a reserve officer for the Dallas County Sheriff's Department and a paramedic and firefighter for the City of Irving, examined Defendant. Jones cleaned some of the blood from Defendant's hand injury which by that time was bleeding very little. Jones asked Defendant a number of questions designed to ascertain his level of consciousness. These questions included: the date; the name of the President of the United States; the paramedic's name and whether Defendant was aware of what was going on around him. Defendant gave appropriate and correct answers to these questions.

"10) Defendant then began giving a statement concerning the offense to Lieutenant Potts. Potts had the statement reduced to writing on a preprinted voluntary statement form. In the presence of Magistrate Boardman, Potts read the statement to Defendant. Boardman told Defendant that he did not have to sign the statement. Defendant stated, 'I might as well. I did it.'

"Defendant signed the statement with his left hand; Potts and Boardman also signed. This statement appears in the record as State's Exhibit No. 44.

"11) Thereafter, Jones cleaned Defendant's hand wound, put the hand on an armboard for support and elevated it to reduce throbbing. Jones checked Defendant's pupil response; which was normal. Defendant's blood pressure was taken (88/60) as was his pulse (88). Because Defendant's blood pressure was low, Jones called Parkland Hospital to obtain permission to treat Defendant. As a result of this call, Jones received authorization to administer Ringer's lactate solution.

"12) After Defendant signed the statement, Jones checked Defendant's blood pressure and pulse, receiving the same results. He asked the same questions he had asked Defendant previously; Defendant gave appropriate answers to all

questions. After receiving Defendant's permission, Jones administered the intravenous solution and Defendant was transported to Parkland Hospital by squad car.

"13) Upon arrival at Parkland Hospital Defendant's blood pressure had risen to 142/92. In all, Defendant was administered three liters of intravenous solution."

The trial judge found that the first confession was made freely and voluntarily. Implicit in this finding is the conclusion that the appellant was not suffering from shock at the time he made and signed his first confession.

■ The trial judge is the trier of fact at a hearing on the voluntariness of a confession. In that role, he is the exclusive judge of the credibility of the witnesses as well as the weight to be given to their testimony. *Vigneault v. State*, 600 S.W.2d 318 (Tex.Cr.App.1980); *Barton v. State*, 605 S.W.2d 605 (Tex.Cr.App.1980); and *Bonham v. State*, 680 S.W.2d 815 (Tex.Cr.App. 1984). The trial court may choose to believe or disbelieve all or any part of any witness' testimony. *Waller v. State*, 648 S.W.2d 308 (Tex.Cr.App.1983). Appellate challenges to the trial court's determinations of fact or applications of law should be directed to whether the trial court abused its discretion. *Barton, supra;* and *McCoy v. State*, 713 S.W.2d 940 (Tex.Cr. App.1986).

■ In the instant case, the trial court resolved the issues of fact against the appellant, and we hold that the trial court's findings are supported by the evidence adduced at the hearing. There was testimony at the hearing that the appellant's blood pressure was low and his pulse was high. But the testimony of the paramedic who treated the appellant at the station disputed the allegation that appellant was in shock. He explained that even though the appellant exhibited some of the symptoms of shock, they did not conclusively show that the appellant was in fact in shock. The paramedic testified that the appellant was oriented to time and place and that his pupil response was normal. He concluded that appellant was not incapacitated from shock. The magistrate, who was present to give the appellant the warnings set out in Art. 15.17, V.A.C.C.P., testified that appellant did not appear incapacitated and that appellant told him that he felt up to talking to Lieutenant Potts. The magistrate testified he would not have permitted the interrogation if it appeared that the appellant was in shock.

We find that the record amply supports the trial court's findings that the appellant knowingly and voluntarily gave the authorities his first confession. Appellant's first point of error is overruled.

In his second point of error, the appellant complains that the trial court erred when it admitted into evidence during the guilt adjudication phase of his trial the second confession which he gave to the authorities. This second statement was taken from the appellant three days after his arrest. Appellant argues that this second confession flows unlawfully from the first confession without any intervening circumstances to remove any unlawful taint.

Since we have already decided that the appellant's arrest was lawfully made and that his first confession was voluntarily given, there was no taint which could flow to the second confession. The appellant's second point of error is overruled.

In his third point of error, the appellant complains the trial court erred when it admitted State's Exhibits 58 and 59 into evidence. The exhibits were offered during the State's cross-examination of the appellant at the guilt determination phase of the trial.

We take note this is a multifarious point of error wherein the appellant has grouped eight arguments concerning these exhibits. The arguments question the relevancy of the exhibits, the quality of the exhibits as proper impeachment, and the probative value of the exhibits. This Court has sought to prohibit the use of multifarious points of error by attorneys on appeal. Tex.R.App. Proc.R. 74(d). In the interest of justice, and due to the finality of the punishment, all of the appellant's arguments under this

point of error were reviewed. Tex.R.App. Pro.R. 74(p).

State's Exhibit 58 is a photograph which accurately depicted the wall above the appellant's bunk in the Dallas County Jail while he was incarcerated there prior to this trial. State's Exhibit 59 is also a photograph depicting another part of the wall above the appellant's bunk. Both photographs were important for their display of the writings on that wall. State's Exhibit 58 displayed the words, "Kill, kill, Judge, D.A.", as well as the words "forgive"; "I love Tommy"; "RLC"; "two counts capital murder". State's Exhibit 59 displayed only the phrase, "Kill all white pig police."

Appellant argues that the admission of these two exhibits into evidence prejudiced and inflamed the minds of the jurors against him. He also asserts that this prejudicial impact was not outweighed by the probative value of the photographs. Appellant states that the exhibits had little, if any, probative value because there was no evidence establishing that he made the writings, the writings were not proper impeachment of appellant, and they were not relevant to a contested issue at either the guilt determination phase, or the punishment phase of the trial. We will review the relevant facts in the record to make the evidentiary balance between probative value and prejudicial impact.

When the appellant took the stand to testify, the jury had already heard evidence which was relevant to his intention to commit the alleged offense. Officers Mitchell and Crain both told the jury that they saw Officer Kovar go behind the store with his handgun drawn and flashlight on, they both heard Kovar yell, "Halt. Get up", and then they heard the exchange of gunfire. The implication of their testimony is that the murderer knew that Kovar was an officer attempting to arrest him to prevent the burglary of the store, and that Kovar was shot to prevent the arrest.

The appellant testified on direct examination to deny this implication. He stated in response to his attorney's questions:

"A. The light, the flashlight itself, was reflecting on the side of it, just a little bit. I seen the shadow of the gun, is what it looked like to me.

\* \* \* \* \* \*

A. I couldn't actually see nobody behind the flashlight.

\* \* \* \* \* \*

A. I heard a voice say something. 'Halt' or 'Get up.' "

The appellant denied knowing that Kovar was a peace officer when he shot at him. He also explained:

"A. ... I would say we shot about the same time. Almost immediately at the same time.

Q. (Defense Counsel): What did you think when that gun swung onto you?

A. I felt that I was myself going to die. And I was afraid of dieing. [sic]

Q. And that's when you started firing your pistol?

A. Yes, sir.

Q. ... did you realize whether or not you shot this figure that you saw in the dark?

A. No, sir, I didn't know I had."

Appellant's argument was that he acted only in self-defense, after he saw the "figure" with the gun.

Later, while attempting to establish that the appellant did not enter the premises of the Landers Store with the intent to kill anyone who interfered with him, the appellant's attorney asked him about whether he could have acquired a handgun prior to going out on this night of burglarizing. The appellant stated that if he had wanted to take a gun with him, he could have taken the handgun which was kept at his mother's house. The appellant also explained that he had never been convicted of carrying a weapon along with him on a burglary, or of carrying a weapon unlawfully. His attorney asked him why he took the handguns from one of the previous burglaries he committed that night.

"Q. (Defense Counsel): Do you have any idea, why you took that pistol?

A. No, sir, I just picked it up, just kind of a reaction to something.

Q. What was your purpose in taking the pistol in that burglary?

A. I had no reason for carrying a pistol. I can't really explain a reason for it. I've never even used a pistol or shot a pistol but one time in my life.

\* \* \* \* \* \*

Q. All right. Well, what was your purpose in taking those two pistols from the steel company?

A. When I seen the pistols, I figured that I might be able to sell them."

The appellant implied, by this, that he was not a man of violent intentions. The State argues that the appellant's testimony on direct examination helped to build the predicate for the admission of State's Exhibits 58 and 59. In his testimony, appellant attempted to create an impression in the minds of the jury that he did not set out on his night of burglaries with the intent to shoot, or harm, anyone. He also sought to impress upon the jurors that he did not know that Kovar was an officer, or that he had shot Kovar. His theory was that he acted only in self-defense.

The State sought both to impeach this testimony, and to show that the appellant had a predisposition to violence against people in law enforcement. On cross-examination, the attorney for the State questioned the appellant on these matters, including the appellant's state of mind after his most recent parole from the Texas Department of Corrections. The State wanted to rebut the issue of whether appellant acted in self-defense.

"Q. (State's Attorney): When you left, paroled down there this last time, you made up your mind that you weren't never going to go back; isn't that right?

A. Yes, sir, I did.

Q. Unless you killed a cop on the way?

A. No, sir, that thought never entered my mind.

Q. You don't like police, do you?

A. I do.

Q. You do?

A. Yes, sir.

Q. Be real sure about that.

A. *I have actually had personal friends that were police officers.*

Q. Okay. How about judges and D.A.'s?

A. I've never known any personally.

Q. Like or dislike any of them, just from being in the court system, being in the judicial system?

A. No, sir, I hold nothing against them.

Q. Okay. You're real sure about that?

A. Yes, sir, I am.

Q. And you're the person that's never fired a pistol but back when you were fifteen out there on the ranch?

A. Yes, sir, that's true." (Emphasis added)

The State argues that it is the above testimony that laid the predicate for the impeachment of the appellant with the admission of the two photographs. Appellant responds that there was no proof that he made the writings. When he was given an opportunity on cross-examination to explain them, the appellant flatly denied making the writings on the wall above his bunk. The State sought to prove otherwise.

In reviewing the trial court's decision that the State successfully established that appellant made the writings, so that the exhibits were admissible against him, we will review all of the evidence in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

On the appellant's side, we have his unequivocal testimony that he did not make the writings displayed in the two exhibits. On the prosecution's side, we have the testimony of two of appellant's cellmates, Robert Banschenbach and Gary LaCour. The State called LaCour to the stand to testify about the appearance of the writing on the wall.

"A. Well, one morning I was sitting in there reading, and I heard something on, you know, scratching on the wall.

Q. (State's Attorney): Okay.

A. And so I got up, you know, kind of curious to what was going on, and I went

up to turn the TV on, because you've got to pass in front of his cell to get to the TV, and I noticed, you know, he was scratching something with an 'L', like, you know—and then I noticed later on there was stuff wrote all over the wall.

Q. Okay. Let me show you what's been admitted into evidence as State's Exhibit Number 58. You see that?

A. Yes, sir.

Q. What, in regard to that, did you see this defendant scratching? This is on the wall above his bunk; is that correct?

A. Be right here, yes, sir.

Q. And you're pointing to the L's?

A. Yes, sir.

Q. Was that on there before you saw the defendant doing that or not?

A. No, sir.

Q. Was not on there?

A. No, sir.

Q. Okay. You're sure of that?

A. I'm positive.

Q. Okay. Did you see him doing the rest of these—it says 'Kill, kill, Judge, D.A.'—did you see him doing all of that or just the 'L'?

A. No, sir, just the 'L'.

Q. How long was that scratching going on, if you know?

A. Probably about ten minutes.

Q. 59, was that on the wall before this time that you say you saw the defendant scratching that 'L' on the 'kill'?

A. No, sir.

Q. You did not see him putting this on; is that correct?

A. No, sir. No, sir.

Q. After—let me rephrase that.

Did you ever go in there and look, after you heard this scratching and seen him doing the 'L', and see both of the items that are on these pictures scratched above his bunk?

A. After—

Q. Yeah, after you saw him scratching the 'L'?

A. Yeah, later that night."

The witness LaCour saw the appellant "scratching" in one of the "L"s in State's Exhibit 58 ("Kill, kill, Judge, D.A."). He stated that neither that writing, nor the one portrayed in State's Exhibit 59, were on the wall prior to the time that he saw the appellant writing on the wall that night. Though he did not see the appellant working on the writing in Exhibit 59, he heard the appellant writing on the wall again that night. He also saw what was depicted in Exhibit 59 for the first time later that night.

The witness Banschenbach did not testify that he saw appellant make either writing. However, he did testify that he had several conversations with the appellant about his trial. He stated that he heard the appellant make the statement, "Well, if they give me the death penalty, I'm going to take a couple of these fuckers with me." The appellant, according to Banschenbach, also stated that he was aware that he was shooting at a police officer when he shot Kovar. Even though this witness did not see the appellant writing the phrases used for impeachment, the statements made by appellant were consistent with the writings. This connected the appellant to the writing of the phrases.

█ We conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant made the writings. There was sufficient evidence before the trial court to support that conclusion. We must now decide whether the exhibits were admissible as proper impeachment and whether they were relevant evidence at both stages of the appellant's trial.

As for being proper or improper impeachment, it is important to resolve whether the appellant's statements justified the State's use of Exhibits 58 and 59 to impeach him. Did the appellant open the door by trying to convince the jury he wasn't trouble or danger for the police? Cf. *Nelson v. State*, 503 S.W.2d 543 (Tex. Cr.App.1974). The appellant argues that it was the State's questions on cross-examination which independently created the grounds for impeachment by the exhibits. *Shipman v. State*, 604 S.W.2d 182 (Tex.Cr. App.1980).

■ In the instant case, the appellant's testimony on direct examination created the impression that he was a non-violent person interested only in committing property crimes, and that he had no intention of causing anyone harm during his burglary of the Lander's Store. The State's questions on cross-examination were not the first to raise the collateral matter of the appellant's violent tendencies, especially towards people in authority. This issue was raised by appellant on direct. When the State began its cross-examination on this matter, the appellant volunteered the statement that he "actually had personal friends that were police officers." This assertion was offered gratuitously by the appellant, when he could have merely answered the prosecutor affirmatively or negatively. The gratuitous testimony, that the appellant was a friend of the police, was collateral to the matter at trial. *Shipman, supra,* is distinguishable.

A defendant who takes the stand as a witness may be impeached as any other witness. The defendant's character as a witness was in issue the minute he took the stand. 1 Ray, Texas Practice: Law of Evidence, Secs. 643, 649, pp. 571–574 (3d ed. 1980). The defendant may be impeached by prior inconsistent statements. *Ray, supra,* Sec. 642 (Pocket Supp.1986); Vernon's Ann.Rules Crim.Ev.Rule 612(a). In the instant case, the appellant made a false insinuation about his relationship with the law enforcement community in Dallas County, in an effort to bolster his defense that he would not intentionally shoot at a police officer. This was part of the appellant's trial strategy to convince the jury that he only acted in self-defense. As such, State's exhibits 58 and 59 were proper impeachment of the appellant's testimony.

■ These exhibits also were relevant to a contested issue at the guilt determination phase of the trial. At that stage, the appellant testified that he was not aware that he shot at a police officer. Appellant gave the impression that he was legitimately acting in self-defense. The exhibits were relevant because they showed the appellant had a hatred of people in law enforcement, and exhibited a tendency to violence toward them. See *Brandley v. State,* 691 S.W.2d 699 (Tex.Cr.App.1985). In his brief, appellant conceded these exhibits were relevant to the second special issue of the punishment phase of his trial. Art. 37.071(b)(2). The exhibits did indicate a proclivity of the appellant to commit criminal acts of violence that would constitute a continuing threat to society. We find the exhibits were relevant evidence at both stages of the appellant's trial.

Even though these exhibits represent inflammatory statements,[3] we find their probative value exceeds the prejudicial impact they might have on the jury. The State proved the appellant made the writings in the exhibits. The exhibits were proper as impeachment of the appellant's testimony. They were also relevant to material issues at both stages of the trial. Point of error three is overruled.

In point of error eight, the appellant complains of an improper argument made by one of the prosecutors during final argument at the guilt determination phase of the appellant's trial. The appellant argues that the prosecutor's statement was both a comment on the appellant's failure to testify at a pre-trial hearing and an argument outside the record at trial.

This dispute began with an argument by counsel for the appellant. Appellant's counsel criticized the State's presentation of its case, and the fact that the State failed to call the paramedic Jones to the witness stand during its case in chief.

"And who, among all those 250 officers is standing there but a paramedic? He's been there, remember, since about 2:00 that morning. I'm talking about Richard Hart.

And who called that witness, incidentally? The defendant called Richard

---

3. Compare to cases where the State impeached a defendant with his extraneous offenses. *Hoffman v. State,* 514 S.W.2d 248 (Tex.Cr.App.1974); *Hammett v. State,* 713 S.W.2d 102 (Tex.Cr.App. 1986). Here, the evidence did not place the appellant in a situation where he was tried for being a criminal, generally.

Hart to testify about the medical condition."

The counsel for appellant confused the name of the arresting officer with the name of the paramedic. After the above statement was made, the trial court corrected the confusion of defense counsel.

The attorney for the State responded to the criticisms of the presentation of the State's case in chief with a point by point approach.

"And I'm certainly not going to misquote any testimony the way I remember it, but I do want to go through some of what I call the misquotes from Mr. Scoggins over here."

During these refutations of "misquotes", the attorney for the State made the statement which is the subject of this point of error.

"Well, you recall it was Officer Hart that arrested this man over here, not Jones. And it was Officer Jones, Paramedic Jones, Fireman Jones, that took care of him. Those are the proper names.

*And, yes, we waited to call—he would have been called; I listed him as a witness. Would have been a lot easier, I suppose, if the defendant had testified. But as you recall, you know that Officer Potts, Officer Williams, Mr. Jones, Mr. Hart, all testified at a pretrial hearing that these lawyers and this defendant hear, and I didn't get to hear Johnny's testimony until the same time you did.*

[DEFENSE COUNSEL]: Your Honor, we'll object to his testifying during the argument. Ask that the jury be instructed to disregard it.

[PROSECUTOR]: That's in evidence, Judge.

THE COURT: Overruled.

[PROSECUTOR]: They knew what they were going to say. I would have rather that he'd been able to testify and then we call Mr. Jones in rebuttal. We didn't have to.

4. One can only wonder why the prosecutor failed to ask Jones on cross-examination if he

You remember how Mr. Scoggins, as I said, danced all around it? Tell us everything about it. Tell us everything about it that helps us, Mr. Jones, and leave out the parts that hurt." (Emphasis added)

On this point of error, the appellant complains that the underlined quotation was a comment on the appellant's failure to testify at the pre-trial hearing. We note, however, that this was not the objection which appellant made at trial. An objection raised on appeal will not be considered if it varies from the objection made at trial. *Euziere v. State,* 648 S.W.2d 700 (Tex.Cr.App.1983); *Wagner v. State,* 687 S.W.2d 303 (Tex.Cr.App.1984); and *East v. State,* 702 S.W.2d 606 (Tex.Cr.App.1985).

Appellant also complains that the prosecutor's argument was an argument outside the record. His objection at trial sufficiently comports with this objection on appeal.

The appellant is correct in pointing out that the prosecutor is not allowed to go outside the record and argue facts not in the record. The State responds that its argument was invited by the appellant during his argument. The State asserts the invited argument rule permits prosecutorial argument outside the record in response to defense arguments which go outside the record, except that the prosecutor's argument may not exceed the scope of the invitation. *Johnson v. State,* 611 S.W.2d 649 (Tex.Cr.App.1981).

The appellant claims that his argument was part of the record of the case before the jury: that after the State rested its case in chief, the appellant called the paramedic Jones to testify about the appellant's condition at the time of his first confession. The inference, that the State sought to keep Jones' testimony from the jury, was a reasonable deduction from that fact.[4] Since the appellant's argument was not outside the record, there was no invitation for the prosecutor to respond. The trial court erred in overruling the appellant's objection.

had received his subpoena to appear for the State prior to trial.

■ Though we find the argument to be improper, we also conclude that it was harmless. The essence of the improper argument was that the State had placed the witness Jones on its list of witnesses to call during its case in chief, but made a tactical decision not to call him in case they needed him for rebuttal.

We are able to conclude that this argument, beyond a reasonable doubt, did not contribute to the verdict of guilty, or the punishment assessed. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967); *Williams v. State*, 643 S.W.2d 136 (Tex.Cr.App.1983); and *Montoya v. State*, 744 S.W.2d 15 (Tex.Cr.App. 1987). The facts are irrefutable, in light of appellant's two confessions that he intentionally and knowingly caused the death of a peace officer who was acting in the lawful discharge of his official duty. At punishment, the jury knew that appellant had been to the penitentiary twice for burglary, once on a probation revocation and again on a regular conviction. They also knew of his conduct in jail. The erroneous argument, that the State had Jones on its witness list, was harmless. Point of error eight is overruled.

■ In point of error nine, the appellant complains the trial court erred when it denied the appellant's motion for mistrial in response to an argument by the prosecutor during the guilt determination phase. The appellant claimed the said argument by the attorney for the State was outside the record of the case. During the State's closing argument, the following argument was made:

> There's Ray Kovar. That's the man who served his country in the Air Force, the man who was married for almost nine years, the man who was a deacon in his church. That's the man who worked for the Sheriff's Office for eight—over eight years, and the kind of man that they want you to believe that would shoot first at a man lying on the ground, because that's the kind of peace officer he was; and yet, that's the man who, I submit to you under the evidence, that worked in the jail for over eight years,

and no prisoner ever complained about him, ever said anything bad about him, or they'd—

> [DEFENSE COUNSEL]: Your Honor, I object to that.

> [PROSECUTOR]: —have brought that evidence to you, too.

> [DEFENSE COUNSEL]: That's testifying. That's outside the record. There's no evidence whatsoever that there were not complaints lodged against him.

> [PROSECUTOR]: Oh, come on, now. You want to reopen and take the stand, Mr. Scoggins? You know better than that.

> [DEFENSE COUNSEL]: I'd ask the Court to rule on—

> THE COURT: Your objection will be sustained.

> [DEFENSE COUNSEL]: Ask that the jury be instructed to disregard it.

> THE COURT: Jury will disregard the last argument.

> [PROSECUTOR]: May I answer his sidebar remark, Judge, that is incorrect?

> THE COURT: No, sir. Address your arguments to the jury, please.

> [DEFENSE COUNSEL]: Ask for a mistrial, Your Honor.

> THE COURT: Motion will be denied.

The appellant asserts the instruction to disregard was not sufficient to cure the error of the above argument. We disagree.

The State's argument in the instant case was outside the record. The appellant never attacked the credibility, or the good reputation, of the deceased in his argument. The appellant properly objected that the prosecutor was "testifying ... outside the record" to the jury. This is not a case where the prosecutor's argument was invited by an improper argument outside the record by appellant. The prosecutor's argument was not invited. *Johnson, supra; Franks v. State*, 574 S.W.2d 124 (Tex.Cr. App.1978). It was not one of the four approved forms for a jury argument. *Alejandro v. State*, 493 S.W.2d 230 (Tex.Cr. App.1973). As such, the prosecutor's argument was an improper remark attempting

to vouch for the credibility and reputation of the deceased.

■ The trial court did sustain the objection, cut off an attempt by the prosecutor to expand on his improper argument, and instructed the jury to disregard the statement of the prosecutor. This was sufficient to cure the error. In *Drakes v. State*, 505 S.W.2d 892 (Tex.Cr.App.1974), a prosecutor made a similar attempt, arguing outside the record, to bolster the credibility and reputation of a rape victim. In that case, we also held that the instruction cured the error. Point of error nine is overruled.

In his fourth point of error, the appellant complains of the testimony of the State's expert witness at punishment. Specifically, the appellant states it was error for the State to include in the hypothetical question, which was propounded to the expert, assumptions not supported by the record. At the punishment stage of the trial, the State placed Dr. Clay Griffith on the stand to testify as to the probability the appellant would commit acts of violence that constitute a continuing threat to society. Art. 37.071(b)(2), V.A.C.C.P. Because Dr. Griffith was not allowed to personally examine the appellant, he formed his expert opinion based upon the assumption of the hypothetical set out by counsel for the State.

While the State's attorney explained the hypothetical, the appellant interrupted six times to object to six of the assumed facts as not being supported by the record.

■ After reviewing the record, we find that appellant correctly pointed out that two of the assumptions in the hypothetical were not supported by the record. First, the attorney for the State incorrectly assumed that the record showed that appellant was discharged from the Navy for unsuitability. Though he successfully elicited admissions from the appellant that the navy disciplined appellant for being absent without leave and for specific disobedience of a superior officer, the appellant never admitted that he was discharged for unsuitability. There was no evidence to support the assumption.

Second, the attorney for the State incorrectly assumed that the appellant had a "spotty" work record from the date of his second parole in March of 1982 until the commission of the instant offense in June of 1982. There was no evidence in the record to support this assumption. The remaining assumptions, complained of by the appellant, were supported by evidence in the record.

■ It is settled in this State that psychiatric expert opinion testimony of a defendant's future dangerousness may be based solely upon hypothetical questions, without the benefit of an examination of a defendant. *Vanderbilt v. State*, 629 S.W. 2d 709 (Tex.Cr.App.1981) cert. denied, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984); and *Holloway v. State* (on remand), 691 S.W.2d 608 (Tex.Cr.App. 1984). The assumptions of the hypothetical must be based on facts within the personal knowledge of the witness, or facts assumed from common or judicial knowledge, or facts supported by evidence. *Holloway v. State*, 613 S.W.2d 497 (Tex.Cr.App.1981). Although a hypothetical must comply with these requirements, the counsel who propounds the hypothetical may "assume facts in accordance with his theory of the case." His opponent may, on cross-examination, secure the expert's opinion upon a different set of facts, including facts assumed by the opponent in accordance with his own theory of the case. *Barefoot v. State*, 596 S.W.2d 875, 887–888 (Tex.Cr.App.1980), cert. denied 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed. 2d 996 (1981).

In the instant case, the two assumptions which were not supported by the record also could not reasonably be assumed from the facts in the record in accord with the State's theory, especially in light of the outright denials by the appellant on cross-examination.

■ We also find that these two erroneous assumptions could not have adversely influenced the expert's opinion against the appellant. The rest of the assumptions in the hypothetical were sufficient to support the conclusion of the expert in the instant

case, and outweighed any impact from the erroneous assumptions. We set out the rest of the hypothetical which was laid before the expert:

[PROSECUTOR]: I'd like to assume these following facts, Dr. Griffith, that the person I'm talking about is a white male, twenty-four years of age at the present time, born on December the 30th of 1957, so he'll be twenty-five in a couple of months.

That this man completed the tenth grade of high school and dropped out— and dropped out in the eleventh grade. That there is a question whether he was dropped from school for excessive truancy or just dropped out on his own, but—

.     .     .     .     .

The prosecutor then set out the first two assumptions which appellant claims on this appeal are not supported by the evidence. Both assumptions dealt with the appellant being discharged from the Navy for unsuitability. He then presented the rest of his hypothetical.

That on December of 1975, the 19th, this man was separated from the United States Navy and came to live in the State of Texas, East Texas—Rusk, Henderson County—and lived with his mother.

That approximately a year later, December the 13th of 1976, this man was convicted for the offense of burglary and received a five-year probated sentence.

This man stated that at the time he received that probation, he understood the terms and conditions of probation and that he understood the first term and condition of probation, which is commit no offense against the laws of this state or any other state or the federal system.

And yet, two months later, on February the 11th of 1977, this man was charged with and arrested for another burglary. And that in September of that same year, 1977—actually September the 19th—been in jail since February the 11th, he was convicted of burglary and sent to the penitentiary.

.     .     .     .     .

He was sent to the penitentiary for a sentence of five years and was given his back time to February 11th.

On April the 25th of 1978, assume further that this man was in court again at the original court where he received the probation back in December of '76 and that probation was revoked and sentence was to run concurrently with the five-year sentence that he had received in September of 1977. He returned to the penitentiary.

That this man was than paroled from the penitentiary. I want you to assume that while on parole for these first two convictions, on August the 11th he committed a burglary in Van Zandt County, 1979, and returned to the penitentiary for the third time for a two to three-year sentence, and that in March of 1982, this man was paroled again and returned to Dallas County.

I'll ask you, Dr. Griffith, if you would look at what's been admitted into evidence as State's Exhibits 53 and 54, and I'd ask you specifically to look at the pictures in both of those exhibits where it shows the man who was sentenced to the Texas Department of Corrections.

.     .     .     .     .

[PROSECUTOR]: Have you had a chance to look at both those exhibits, Doctor?

[WITNESS]: Yes, I've looked at them.

[PROSECUTOR]: Okay, thank you. Dr. Griffith, I want you to assume further that this man that we're talking about, the last time he was in the penitentiary, lost what is referred to in the penitentiary as good time because he refused to obey orders down there four times and refused to work four times and also was in a fight during this last stay in the penitentiary before being paroled in March of 1982.

At this point, the prosecutor asked the third assumption complained of on appeal that appellant had a spotty work record from the date of his release from prison until the date of the instant offense. He then proceeded with the hypothetical.

[PROSECUTOR]: However, this person purchased an automobile, a Jeep, and that this became a very important object and aspect of this person's life.

[DEFENSE ATTORNEY]: Your Honor, we'll object to that on the basis the record affirmatively shows that he didn't purchase the Jeep, that someone else did, and that there's no evidence to support the statement that it became a very prominent object in his life. Ask that that not be considered and be stricken from the record.[5]

THE COURT: Overruled.

[PROSECUTOR]: Let me ask you further to assume, Dr. Griffith, that on June 20th, 1982, in an effort to obtain money, this man committed three more—or burglarized three more buildings, while on parole for burglary, and that in one of those buildings took two .38 caliber, loaded pistols, and took only these two items from this building where there were also calculators on the desks, typewriters—

[DEFENSE COUNSEL]: We'll object to that also as not being in evidence, Your Honor, and ask that it be excluded from the hypothetical question.

THE COURT: Overruled.[6]

[PROSECUTOR]: —and television sets. However, along with the two pistols, the only other item taken was a bottle of 7–Up, a large—I think they call them liter bottles.

This man then proceeded about half a mile further down the road and came to a closed, locked mercantile store. And that up to this time, this man had not been drinking any alcoholic beverage, had not been smoking any dope.

And I ask you to assume further, Dr. Griffith, that this man then, with a tire tool in his left hand and one of the pistols that he had taken just a short time before in his right hand, began to burglarize this locked, closed mercantile store.

.       .       .       .       .

[DEFENSE COUNSEL]: Your Honor, we'll object to that also as being outside the evidence. Ask that it be excluded from the hypothetical question.

THE COURT: Overruled.

[PROSECUTOR]: While in the course of committing this burglary, this man was discovered first by some citizens and then by a Dallas County deputy sheriff.

That within ten minutes of the time between being first discovered by a deputy sheriff, other deputy sheriffs from Dallas County arrived at the scene of the mercantile store.

That during this ten-minute period, this man saw a marked Sheriff's squad car, heard sirens, saw flashing red lights that could only come from a police-equipped vehicle.

[DEFENSE COUNSEL]: Your Honor, we'll object to all of that hypothetical as not being supported by the evidence and ask that it be excluded from the hypothetical question.

THE COURT: Overruled.[7]

[PROSECUTOR]: This man then says, hypothetically, in his own words, that after these various deputy sheriffs arrived at the scene that he was at the rear door—and let's assume he's talking about the building there—that he looked and saw a flashlight and a gun pointing at him—"at me."

Assume then that the man says, "I then started shooting at him. I believe I shot five times. The officer also shot at me, and I was hit in the right hand by a bullet."

Assume that he ran from the rear of the building in a northerly direction, believed he threw the pistol down about a hundred yards from the store, and then

---

5. This was the fourth assumption complained of on appeal. In light of the appellant's admissions on cross-examination that he committed the burglaries to make the monthly payment, and that he could have sold the pistols he stole from one of the offices, this assumption was reasonable in light of the evidence.

6. This was the fifth assumption complained of on appeal. It was also supported by the record.

7. This was the sixth assumption complained of on appeal. It was supported by the testimony of the appellant's cell mate, LaCour, who stated that appellant told him he knew he killed a police officer.

he—assume that this man says, "I didn't actually"—and "actually" is my word, but—"didn't see the person I shot, but I knew it had to be a police officer."

Assume that after this happened, this man has been arrested and charged with the offense of capital murder for shooting this police officer—actually a deputy sheriff.

Assume further that this man has been convicted by a jury of the offense of capital murder.

Also, Dr. Griffith, I want you to assume that since this time period, this man, amongst his contemporaries—because he's been in jail—has bragged about this offense, appears to be quite proud of it. Has also stated that if he is convicted, he'll take some more pigs with him. By "pigs" I want you to assume he's talking about police officers.

Ask you to assume further that the man who has done all of these things, while in jail, above his bunk would write what's contained on State's Exhibits 58 and 59—if you will look at those.

(Witness examines exhibits)

Ask you to assume further these facts, Dr. Griffith, that this man has stated under oath that while he was armed and at the rear of the building that he would shoot and kill anyone who came upon him as he described this officer; that is, with a flashlight in one hand and what appeared to be a weapon in the other; if he thought they were going to kill him, he would have killed them, no matter who they were.

Let me ask you that, if you recall, this man stated he had been shot in the hand, that at the time, about five or six hours later when a medical doctor, a surgeon was getting ready to amputate the finger on his hand that was amputated, that the medical doctor asked him if he was worried or afraid about having killed a police officer, and the answer was, "I'm only interested in what's going to happen to my hand. I'm not worried about that officer."

This man has bragged about being on TV as a result of being arrested and

charged with the offense of capital murder.

Assume further that during the jury selection process, this man attempted to have a fellow inmate bribe a potential juror to cause a hung jury in his trial.

This man has stated to several people and stated under oath that he did not want to ever return to the Texas Department of Corrections, and if he did, he would—as I said earlier, he would take other pigs with him.

.     .     .     .     .

Let me ask you, on the hypothetical facts I've given you, if you've got an opinion regarding this man that we're talking about in this hypothetical situation as to whether there is a probability that this individual will commit future criminal acts of violence that would constitute a continuing threat to society?

[DEFENSE COUNSEL]: Your Honor, I'll object. That invades the province of the jury.

THE COURT: Overruled.

In the context of the entire hypothetical question, the assumptions of appellant's discharge for unsuitability and of his spotty work record have little impact. The expert's opinion would have been the same, since he considered other assumptions to be better indicia of future dangerousness:

[WITNESS]: Well, yes, I have an opinion. First of all, you tell me that this person says that they are going to commit future acts of violence, that they're going to kill, and he does his own predicting, right there.

One of the best things that we have to go on is that behavior predicts behavior, and this man has progressively gone up the scale in an ascending manner and gotten worse and worse and worse. Don't know how you can get any worse than what he's already done, unless the frequency is allowed to—

Q. [PROSECUTOR]: Okay. And that's—now can you get any worse than say in the hypothetical situation, killing a peace officer?

A. Correct.

Q. And you say the next thing, the only thing worse is the frequency, and this has been predicted by this person; is that correct?

A. That's correct.

Even if the erroneous assumptions were more important to the hypothetical, the appellant failed to object when the expert gave his opinion that the expert's opinion was based on false assumptions. He only objected, "That invades the province of the jury." The error, if any, was not preserved. The fourth point of error is overruled.

In point of error seven, the appellant argues it was error for the trial court to not grant a mistrial when the State attempted to admit into evidence the appellant's refusal to be interviewed by the State's expert witness.

■ When the State called Dr. Griffith to the stand, they first sought testimony from him concerning a letter from appellant's counsel. In that letter, State's Exhibit 62, appellant's counsel informed Dr. Griffith that he did not want Dr. Griffith to interview or observe his client. If appellant's assertion is correct, that the State admitted evidence of appellant's refusal to be interviewed over proper objection, then he would be entitled to relief for violation of his Fifth Amendment right to remain silent. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

When the State first asked Dr. Griffith about the letter, the appellant objected that the answer called for hearsay. This objection was sustained. When the State again asked about the form of appellant's response, the court allowed Dr. Griffith to testify that he received a letter from the appellant's counsel. When the State tried to elicit answers about the contents of the letter, the court sustained the appellant's hearsay objection. The court denied the appellant's request for a continuing objection, and instructed appellant to object to each question.

When the State again asked about the contents of the letter the appellant again objected "on the basis previously stated." When the trial court asked, specifically,

"Anything else?", the appellant responded, "It's hearsay, no other—it's irrelevant, it's not material to any matter at trial." The trial court sustained the objection and instructed the jury to disregard. The trial court refused the request for a mistrial. This refusal is the basis for this point of error. At no time did the appellant object on the grounds that his Fifth Amendment rights were being violated.

Immediately after this, the State asked Dr. Griffith if he was able to interview appellant. There was no objection. The witness answered, "No." There was no objection.

Later, on redirect, the State asked Dr. Griffith, "You did try to talk to him, didn't you, and they wouldn't let you?" The appellant objected, stating only, "Your Honor, the same objection." The objection was sustained, and the jury was instructed to disregard.

Again, there were no objections that these questions violated the appellant's Fifth Amendment right to remain silent.

The questions which the State asked Dr. Griffith were a direct comment on the appellant's refusal to undergo a psychiatric interview. Though appellant raises his Fifth Amendment claim on appeal, this does not comport with his objections at trial. Nothing has been preserved for appellate review. *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984). Point of error seven is overruled.

In his fifth point of error, the appellant argues that the evidence is insufficient to support the jury's finding that there was a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society.

■ A jury may consider all of the evidence adduced during the guilt determination phase of a trial, when it is determining an answer to the second special issue at the punishment phase. *Russell v. State*, 665 S.W.2d 771 at 781 (Tex.Cr.App.1983).

■ The evidence at the guilt determination phase showed that appellant had been sentenced to the penitentiary twice

for burglary, and that he was paroled less than two months before the instant offense. The evidence showed that he had committed two burglaries before attempting to burglarize the Landers' Store, and that he armed himself with a handgun before making the attempt at Landers. The evidence showed that appellant killed a peace officer who was trying to prevent the burglary. One of the appellant's cellmates testified that appellant said he knew he was shooting at a policeman when he killed Officer Kovar.

The evidence at the guilt determination phase also showed that appellant had a premeditated hostility towards figures of authority: peace officers, prosecutors and judges. The evidence showed appellant bragging after the murder to his cell mates that he would take "some more" with him if he got sent to TDC.

At punishment, the State elicited the expert opinion of Dr. Clay Griffith. The State propounded a hypothetical to Dr. Griffith,[8] to which he replied that the appellant exhibited a sociopathic personality, and was likely to commit criminal acts of violence in the future. At punishment, the two penitentiary packets from the appellant's two prison terms were also admitted into evidence.

After reviewing the evidence in a light most favorable to the verdict, *Jackson v. Virginia, supra,* we find it to be sufficient to support the affirmative answer to the second special issue. Point of error five is overruled.

In his fifteenth point of error, the appellant argues that the Texas death penalty statute is unconstitutional because it fails to provide a vehicle for the jury's consideration of mitigating circumstances. This point of error was raised for the first time on appeal. The appellant did not object to the constitutionality of the Texas death penalty statute prior to trial. The appellant presented no evidence at the punishment phase, of a mitigating nature or otherwise. The appellant failed to request a jury instruction on mitigation. Nothing is

preserved for review. Point of error fifteen is overruled.

The judgment of conviction is affirmed.

CLINTON and TEAGUE, JJ., disagreeing with treatment of points of error one, seven and eight, concur in the judgment of the Court.

DUNCAN, J., concurs in the result.

support the jury's affirmative answer to special issue number two.

---

**8.** See discussion of point of error four. The hypothetical included other evidence at trial to