Carlos Alberto **OVIEDO**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 13–88–027–CR.

Court of Appeals of Texas,
Corpus Christi.

Feb. 28, 1989.

Charles Smith, Corpus Christi, for appellant.

Wiley L. Cheatham, Cuero, for appellee.

Before NYE, C.J., and BENAVIDES and DORSEY, JJ.

## OPINION

NYE, Chief Justice.

A jury found appellant Carlos Alberto Oviedo guilty of the offense of possession with intent to deliver a controlled substance, to wit: cocaine. The jury assessed punishment at ninety-nine years' confinement in the Texas Department of Corrections, plus a $20,000.00 fine, together with all costs of court. By two points of error, appellant urges that his warrantless arrest was unlawful and the cocaine obtained was erroneously admitted in evidence. We affirm the trial court's judgment.

At about 12:00 o'clock noon on September 25, 1987, Officers Vinson and Juarez, acting undercover, drove to appellant's residence in order to purchase cocaine from him. Their attempt proved unsuccessful. However, as both officers were returning to their car, appellant told Juarez that he had some business to settle with him. Appellant voluntarily got into the rear seat of their car, and they drove away. He told Juarez to park the car, so Juarez stopped in the La Bahia parking lot. Here, appellant asked Vinson how much cocaine she wanted. She replied that she wanted one gram and told him that she had four hundred dollars. He said that four hundred dollars would be enough and removed a little plastic bag from his shirt pocket. Using his pocket knife, he scooped some white powder out of the bag and placed the knife blade with the white powder on it under Vinson's nose. He told her to try it, and represented to them that the bag contained an "eight-ball," or one-eighth of an ounce of cocaine. He offered to sell the cocaine to them for four hundred dollars. Vinson refused to sample the cocaine, telling him that she felt sick. Appellant put the knife blade under his nose, "snorted" the cocaine, and returned the remainder to the bag. He put the bag back into his shirt pocket. At appellant's suggestion, Juarez started the car and drove to a Dairy Queen so that Vinson could use the restroom. Vinson left the car, entered the Dairy Queen, and snuck out the front door. She walked to a gas station where she met Officers Olivo and Jalufka who were involved in this investigation and who maintained surveillance on appellant, Vinson, and Juarez as they drove from the La Bahia to the Dairy Queen. Vinson informed them that she had just been with appellant in a car, that he had in his shirt pocket an "eightball" of cocaine, that she saw the cocaine, and that he offered to sell her the cocaine for four hundred dollars.

Upon receiving this information, Vinson, Jalufka, and Olivo immediately went to the Dairy Queen parking lot. Olivo arrested appellant, without a warrant, as he sat in the rear seat of Juarez' car. Vinson watched the arrest from a short distance. Once under arrest, appellant stuffed the baggie of white powder into his mouth and began chewing. The officers attempted to recover the baggie, but he swallowed it and said, "You don't have nothing on me." Jalufka saw white powder on appellant's lips and concluded that he had succeeded in breaking the seal on the baggie before swallowing it. Aware that appellant's life might be in danger due to possible cocaine ingestion, Jalufka requested an ambulance. He told the ambulance attendants that appellant "appeared" to have swallowed a large amount of cocaine and needed medical attention. Jalufka testified that he did not order any medical personnel to retrieve

the alleged cocaine from appellant's system or to perform any treatment regimen. He did receive samples of appellant's urine, blood, and gastric juices along with the remains of the plastic baggie. The baggie, blood, and urine contained cocaine. Jalufka received these samples without first obtaining a search warrant. He testified that he would have needed at least "an hour or an hour-and-a-half" to obtain a search warrant. He said that when appellant swallowed the cocaine, "the investigation was off" and he was only concerned with saving appellant's life.

An ambulance whisked appellant to a hospital emergency room. His vital signs indicated a rapid heart beat, elevated blood pressure, dilated pupils, and "sluggish response." Dr. Johnson, appellant's treating physician, testified that these symptoms correlated with cocaine ingestion but may have also been manifestations of some other condition. Johnson informed appellant that she needed to treat him for his cocaine ingestion. She stated that appellant initially refused treatment, but changed his mind and allowed her to perform all of the procedures. A tube was threaded through his nose and inserted into his stomach. This allowed his stomach to be pumped. He was given syrup of Ipecac which caused him to vomit. A nurse testified that appellant drank the Ipecac without any resistance. Dr. Johnson testified that law enforcement authorities did not tell her what medical treatment to give appellant and did not ask her to retrieve anything from his body. The blood and urine samples were taken in order to treat appellant. She said that she followed the medical procedure commonly used to treat overdoses involving ingestion.

Appellant gave his own version of the facts, testifying that on the day he was arrested, two peace officers arrived at his house. He said they informed him that he was in trouble and needed to come with them to the Dairy Queen. He said that when he was arrested, Jalufka hit and kicked him, demanding the cocaine. He said that he informed Jalufka that he did not have anything. However, Jalufka told him that he was taking him to the hospital to recover whatever he had swallowed. Appellant admitted to swallowing a small bag or package, but said it was empty. Appellant testified that he did not consent to anyone administering medical procedures to him.

By his first point of error, appellant argues that the trial court erred in failing to grant his motion to suppress the fruits of his unlawful arrest. He contends that his arrest is unlawful because Officer Olivo, the arresting officer, did not have a sufficient factual basis to arrest him and did not see him commit an offense within his view or presence as required by Tex.Code Crim. Proc.Ann. art. 14.01(b) (Vernon 1977). He also contends that there was no finding by the trial court that he was about to escape. The State maintains that article 14.01 controls this case and no escape need be shown. We agree.

In Texas, the authority to conduct a warrantless arrest is governed exclusively by statute. *Fry v. State*, 639 S.W.2d 463, 465 (Tex.Crim.App.1982), *cert. denied*, 460 U.S. 1039, 103 S.Ct. 1430, 75 L.Ed.2d 790 (1983). Warrantless arrests are authorized only under the conditions specified by articles 14.01–14.04 of the Texas Code of Criminal Procedure. Article 14.01(a) and (b) provide:

(a) A peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace.

(b) A peace officer may arrest an offender without a warrant for an offense committed in his presence or within his view.

After considering the facts and circumstances of this case, we conclude that article 14.01(a) and (b) provide authority for appellant's warrantless arrest. Under article 14.01, the State has the burden to prove that probable cause existed for appellant's warrantless arrest, *Gonzales v. State*, 638 S.W.2d 41, 44 (Tex.App.—Houston [1st Dist.] 1982, pet. ref'd), and that the alleged offense was committed within the arresting officer's "presence" or "view." In determining whether the State met its burden,

we will consider the testimony adduced during the suppression hearing and the trial on the merits. *Hardesty v. State*, 667 S.W.2d 130, 133 n. 6 (Tex.Crim.App.1984); *see also Webb v. State*, 760 S.W.2d 263, 272 n. 13 (Tex.Crim.App.1988).

■ In the instant case, probable cause would exist if, at the moment of appellant's arrest, the facts and circumstances within Officer Olivo's knowledge and of which he had reasonably trustworthy information, would warrant a reasonable, prudent person in believing that appellant had committed the offense of possession with intent to deliver cocaine. *Pyles v. State*, 755 S.W.2d 98, 109 (Tex.Crim.App.1988). In assessing whether Officer Olivo had sufficient knowledge, we are not restricted to consider only his personal knowledge because it is well established that an officer who does not himself possess probable cause for making a warrantless arrest, may act upon the basis of information relayed to him by another officer requesting that an arrest be made. *Pyles*, 755 S.W.2d at 109. Moreover, when there has been cooperation between law enforcement agencies or between officers of the same agency, the sum of the information known to the co-operating agencies or officers at the time of the arrest by any of the officers involved is to be considered in determining whether there was sufficient probable cause for the arrest. *Pyles*, 755 S.W.2d at 109.

■ In the instant case, when Officer Olivo arrested appellant, he knew that Vinson had just been with appellant, that appellant had a baggie of cocaine, and that he showed the cocaine to Vinson, offering it for sale. We conclude that the facts and circumstances within Officer Olivo's knowledge would warrant a reasonable and prudent person in believing that appellant had committed the offense. *See Pyles*, 755 S.W.2d at 109.

By showing Vinson the cocaine and offering to sell it to her, appellant committed an offense in Vinson's presence and view. Although Vinson herself did not make the arrest, her situation is *not* like that of an informant under article 14.04 because she was part of a team of officers present at the scene of the offense. She had first hand knowledge of the offense and relayed her knowledge to Jalufka and Olivo. These officers maintained surveillance on Vinson, Juarez, and appellant. Even though Vinson did not arrest appellant, she observed his arrest from a short distance. She was just as much a participant in the arrest as if she had seized appellant herself. Furthermore, there exists no significant time lapse or intervening event that would remove the arrest from the scope of article 14.01. We hold appellant's arrest to be lawful under article 14.01, *Willis v. State*, 669 S.W.2d 728, 730 (Tex.Crim.App. 1984), and overrule his first point of error.

■ By his final point of error, appellant argues that the trial court erred in admitting the evidence seized from him after his stomach was pumped by police request. He argues that since the substances were removed from his body without a search warrant, the search was illegal under U.S. Const. amend. IV.

Our review of case authority has led us to the conclusion that appellant's contentions are without merit. Invasions of the body of an accused may be made under certain circumstances without constituting a denial of due process or an unreasonable search or seizure, if done by medical personnel using proper medical procedures and if done without brutality which "shocks the conscience." *Schmerber v. California*, 384 U.S. 757, 759–60, 86 S.Ct. 1826, 1829–30, 16 L.Ed.2d 908 (1966); *Breithaupt v. Abram*, 352 U.S. 432, 435–40, 77 S.Ct. 408, 410–12, 1 L.Ed.2d 448 (1957). In *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the United States Supreme Court, relying primarily on its decision in *Schmerber*, announced six factors that should be considered in determining the reasonableness of a body search and seizure:

1. There must be probable cause and a search warrant, absent exigent circumstances;

2. The extent to which the procedure may threaten the safety or health of the individual;

3. All reasonable medical precautions were taken and no unusual or untested procedures were employed;

4. The procedure was performed by a physician in a hospital according to accepted medical practices;

5. The search may be unjustifiable if it endangers the life or health of the suspect; and

6. The extent of the intrusion upon the individual's dignitary interests and personal privacy, and bodily integrity.

*Winston,* 470 U.S. at 759–61, 105 S.Ct. at 1615–17; *see also, Marmolejo v. State,* 743 S.W.2d 669, 670 (Tex.App.—El Paso 1987, pet. ref'd). The Court also stated that these factors should be weighed against the community's interests in fairly and accurately determining guilt or innocence.

At least one Texas appellate court has applied the six factors announced in *Winston* to a body search case. In *Marmolejo,* police, after hearing that accused was selling heroin, approached him and noticed that he swallowed a balloon. They obtained a search warrant to retrieve the balloon and took accused to a hospital where he refused to cooperate, making it necessary to administer an emetic (a substance that causes vomiting) through an esophageal tube. *Marmolejo,* 743 S.W.2d at 669. The accused, after admission of the emetic, regurgitated and a balloon was recovered that contained heroin and cocaine. *Marmolejo,* 743 S.W.2d at 669–70. The El Paso Court of Appeals found accused's body search to be reasonable, noting that the stomach tube was necessary only because accused refused to swallow the emetic voluntarily. *Marmolejo,* 743 S.W.2d at 670.

The circumstances in the instant case also satisfy the six factors announced by the *Winston* Court. Based on Officer Vinson's information, the police clearly had probable cause to believe that appellant had cocaine in his possession and that he offered to sell cocaine to Vinson. After Officer Jalufka observed appellant swallow the unsealed baggie of white powder, it was reasonable for him to conclude that the baggie contained cocaine and that appellant's life could be in jeopardy. Because this case falls within the exigent circumstances exception to the warrant requirement, no search warrant was necessary. *See Winston,* 470 U.S. at 759, 105 S.Ct. at 1615.

The facts here indicate that a physician administered appellant's treatment regimen in a hospital setting, according to accepted medical practices. All reasonable medical precautions were taken and no unusual or untested procedures were used. These medical procedures did not endanger or threaten appellant's life, safety, or health. Finally, the medical procedures administered to appellant in order to save his life did not constitute an unduly extensive imposition on his personal privacy and bodily integrity. The evidence proves that appellant did not resist the medical procedures and strongly supports the finding that he consented. Furthermore, Dr. Johnson did not act as an agent for the State, and no force whatsoever was employed by the medical personnel or the officers.

Appellant relies upon *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). However, in *Rochin* there was not only a stomach pump but also an illegal forced entry into Rochin's bedroom and a resulting struggle during which the officers choked Rochin in an attempt to extract pills from his mouth. It was the entire course of conduct which shocked the conscience of the Supreme Court. As the Court stated, "Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this *course of proceeding* by agents of government to obtain evidence is bound to offend even hardened sensibilities." *Rochin,* 342 U.S. at 172, 72 S.Ct. at 209. (Emphasis added.).

In the instant case, we do not have a "course of proceeding" by the police to obtain evidence that "is bound to offend even hardened sensibilities." We have summarized the evidence that the police believed that appellant's life could be in danger after he swallowed the unsealed

baggie of white powder thought to be cocaine, and that the medical procedures followed in this case were necessary to save appellant's life, according to Dr. Johnson. We will not disturb a finding of fact by the trial judge at a hearing on a motion to suppress as long as it is supported by the record. *Alaniz v. State,* 647 S.W.2d 310, 314 (Tex.App.—Corpus Christi 1982, pet. ref'd).

We therefore hold that under these circumstances, the medical procedures used to remove the cocaine from appellant's body did not amount to an unreasonable search in violation of appellant's constitutional rights. We find no error by the trial court in admitting into evidence the cocaine seized from appellant's body. The final point of error is overruled.

The judgment of the trial court is AFFIRMED.