Mircea Volosen v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-390-CR

MIRCEA VOLOSEN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

OPINION

------------

I. Introduction

The trial court found Appellant Mircea Volosen guilty of animal cruelty for killing a neighbor’s dog, a miniature dachshund named Ginger.  The trial court sentenced Volosen to one year’s confinement, probated for two years.  The sole issue we address in this appeal is whether the State met its burden of presenting legally sufficient evidence that Volosen was “without legal authority” to kill the dog.  
See
 
Tex. Penal Code Ann.
 § 42.09(a)(5) (Vernon Supp. 2005).  Because, by statute,
(footnote: 1) a dog that “is attacking, is about to attack, or has recently attacked . . . fowls may be killed by . . . any person witnessing the attack” and because no rational trier of fact could have determined beyond a reasonable doubt that Ginger was not attacking or had not recently attacked chickens in a pen in Volosen’s yard, we hold that the evidence is legally insufficient to establish that Volosen killed the dog “without legal authority” as required to sustain a conviction for animal cruelty.
(footnote: 2)  Accordingly, we will reverse the trial court’s judgment and render a judgment of acquittal.

II.  The Law Regarding Animal Cruelty

The offense of cruelty to animals includes intentionally or knowingly killing, seriously injuring, or administering poison “to an animal, other than cattle, horses, sheep, swine, or goats, belonging to another 
without legal authority
 or the owner’s effective consent.”  
Tex. Penal Code Ann. 
§ 42.09(a)(5) (emphasis added).  The penal code does not define the term “legal authority,” but the health and safety code contains a section explaining when a person does possess legal authority to kill a dog.  
See
 
Nichols v. State
, 653 S.W.2d 768, 773 (Tex. Crim. App. [Panel Op.] 1983) (op. on reh’g) (recognizing that, to ascertain the definition of an offense, statutes outside the penal code may be examined).  
Former section 822.033 of the health and safety code provided,

(a) A dog that is attacking, is about to attack, or has recently attacked sheep, goats, calves, or other domestic animals or fowls may be killed by any person witnessing or having knowledge of the attack.

(b) A person who kills a dog as provided by this section is not liable for damages to the owner of the dog.

(c) A dog known or suspected of having killed sheep, goats, calves, or other domestic animals or fowls is a public nuisance.  Any person may detain or impound the dog until the dog’s owner is notified and all damage done by the dog has been determined and paid to the proper persons.

(d) The owner of a dog that is known to have attacked sheep, goats, calves, or other domestic animals or fowls shall kill the dog.  A sheriff, deputy sheriff, constable, police officer, magistrate, or county commissioner may enter the premises of the owner of the dog and kill the dog if the owner fails to do so.

Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033, 1989 Tex. Gen Laws 2230, 3142 (amended 2003).  

Because the health and safety code allows a person to lawfully kill a dog that is attacking, is about to attack, or has recently attacked that person’s fowls, a person killing a dog under such circumstances possesses statutory legal authority to kill the dog.  Thus, a person authorized to kill a dog by former health and safety code section 822.033 cannot be said to be acting “without legal authority” to kill the dog as required to commit the offense of cruelty to animals under penal code section 42.09(a)(5).  
See 
Tex. Penal Code Ann. 
§ 42.09(a)(5); 
Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033(a), 1989 Tex. Gen Laws 2230, 3142 (amended 2003). 

III.  Factual Background

Kevin Ball and his family owned a miniature dachshund named Ginger. Volosen, a veterinarian, lived directly behind Ball and kept chickens in a pen in his backyard.  On the morning of July 4, 2003, Ball and his friend, Robert Johnson, were in Ball’s driveway preparing for a cookout.  Ball noticed that Ginger—who had been with them in his driveway minutes before—was missing. He heard Volosen’s chickens clucking and “saw the chickens flutter across [the pen] from one corner to the other.”  Ball “figured the dog was over there playing,” and he looked over the fence and saw Ginger inside the pen with the chickens.  He called for Ginger to come to him, and Ginger stopped “like, oh, no, I’m in trouble.”  Volosen, who had been out in his yard, entered the chicken pen carrying a maul—a tool used to split logs—and Ball said, “Hey, sorry, she got out again.”  Volosen looked at Ball and then struck the dog with the maul, killing it.   

Johnson called the police, and Officer Roy Kevin Walling was dispatched to the scene.  Volosen first told Officer Walling that Ball’s dog was killing rabbits on his property, but when the officer asked if Volosen could show him any dead rabbits, Volosen said that the dog was chasing chickens, not rabbits. When Officer Walling asked if Volosen could show him any dead chickens, Volosen took him to his backyard and pointed to a small shallow hole in the ground that was not big enough for a stapler.  Volosen said that a dead chicken had been lying there and that the dog must have carried it off, but Officer Walling said that was impossible because the dog died in Volosen’s yard.  The officer then arrested Volosen because he failed to produce a dead animal.
(footnote: 3) At trial, Ball testified that Ginger had gone on Volosen’s property twice before July 4th; both occasions occurred a few months prior to the July 4th incident.  On one of those prior occasions, Volosen told Ball to get Ginger off his property, and as Ball was retrieving his dog, he saw a dead rabbit in an elevated cage inside the chicken pen.  Volosen told Ball that Ginger had killed the rabbit. Volosen’s wife testified about the three incidents.  She testified that her husband told her the following: after the first incident, a rabbit died because Ball’s dog had attacked it; after the second incident, three chickens died because Ball’s dog had attacked them; and after the July 4th
 incident, four chickens died as a result of the trauma and stress they suffered.  Mrs. Volosen admitted that she never personally saw a dog attack any rabbits or chickens on her property.  Dr. Liviu Pogan, a veterinarian with a specialization in poultry pathology, testified that female chickens can die from peritonitis, an infection of the abdomen caused by eggs falling into the abdominal cavity.  Dr. Pogan testified that peritonitis can occur from trauma and that the injury may not be visible for several days.

IV.  Legal Insufficiency

Volosen contends that the evidence is legally insufficient to prove that he was acting “without legal authority” under penal code section 42.09(a)(5) when he killed the dog.  He argues that because the dog had attacked his chickens immediately before he killed the dog, he had legal authority to kill it pursuant to former health and safety code section 822.033.  Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033, 1989 Tex. Gen Laws 2230, 3142 (amended 2003).

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to  the judgment in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the judgment.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Ortiz v. State
, 993 S.W.2d 892, 895 (Tex. App.—Fort Worth 1999, no pet.).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried.  
Gollihar v. State
, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); 
Malik, 
953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry
, 30 S.W.3d at 404.
  The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

The question we must answer is whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that Volosen did not have legal authority to kill Ginger.  Stated differently, we must determine whether the evidence most favorable to the State shows that Ginger was not attacking, was not about to attack, or had not recently attacked Volosen’s chickens immediately prior to Volosen striking Ginger with the maul.  
See 
Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033(a), 1989 Tex. Gen Laws 2230, 3142 (amended 2003); 
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Hampton
, 165 S.W.3d at 693.  Before turning to this issue, we address the State’s arguments, both of which attempt to frame the issue differently.

The State contends that prior section 822.033(c) vested Volosen with only legal authority to “detain or impound” the dog, not to kill it, because Volosen only “knew or suspected” that the dog had killed his animals in the past.  
See 
Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033(c), 1989 Tex. Gen Laws 2230, 3142 (amended 2003).  We agree that the attacks by Ginger that occurred months prior to the dog’s July 4th entry into Volosen’s chicken pen did not authorize Volosen to kill it on July 4th pursuant to former subsection 822.033(a) or (c).  
See id. 
at sec. 822.033(a), (c); 
Bueckner v. Hamel
, 886 S.W.2d 368, 372 (Tex. App.—Houston [1st
 Dist.] 1994, writ denied).  But former section 822.033(a) specifically authorizes a person to a kill a dog when he witnesses the dog “attacking” fowls or when the dog “is about to attack[] or has recently attacked” fowls.  Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033(a), 1989 Tex. Gen Laws 2230, 3142 (amended 2003).  And it is this subsection—822.033(a)—that Volosen claims vested him with legal authority to kill the dog, not subsection 822.033(c).  Accordingly, while the State’s argument that Volosen could have impounded the dog under subsection 822.033(c) based on its attacks months before July 4th is accurate, it provides no insight into whether Volosen was “without legal authority” to kill the dog on July 4th based on the dog’s July 4th entry into Volosen’s chicken pen and its conduct in the pen.

The State also argues that some physical injury or harm is implicit in the use of the word “attack” and that the absence of evidence that the chickens were physically harmed constitutes some evidence that Ginger did not attack and was not attacking the chickens in Volosen’s pen on July 4th.  The term “attack” is not legally defined, and in construing a statute, we must give effect to the plain meaning of the text unless the text is ambiguous or the plain meaning would lead to absurd results.  
Parfait v. State
, 120 S.W.3d 348, 349 (Tex. Crim. App. 2003) (citing 
Boykin v. State
, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)).  The use of legal or other well-accepted dictionaries is a method of determining the ordinary meaning of certain words.  
Jones v. State
, 175 S.W.3d 927, 930 (Tex. App.—Dallas 2005, no pet.).  Webster’s Dictionary defines “attack” to include “an offensive or antagonistic movement or action of any kind.”  
Webster’s Third New International Dictionary 
140 (2002).

Further insight into the meaning of the term “attack” as used in penal code section 49.02(a)(5) is contained in 
Bueckner v. Hamel
.  886 S.W.2d at 372.  In 
Bueckner
, the court of appeals held that former health and safety code section 822.033 did not exempt the defendant from civil liability for killing two dogs that had been “chasing” deer on the defendant’s property because deer were not protected under the statute; the statute authorizes a person to kill a dog that is attacking or has just attacked sheep, goats, calves, domestic animals, or fowls, not deer.  
Id.
  Nonetheless, the court of appeals’ statement that the “[t]he [dogs’] 
attack
 on the deer did not justify the shooting” shows that, although not relevant to its holding, the court determined that dogs “chasing” deer constituted an “attack” under the statute.  
See id. 
(emphasis added)
.  
Thus, we decline to define “attack”—as that term is used in former section 822.033 of the health and safety code—as requiring some physical injury or harm.

We now address the legal sufficiency of the evidence to support the “without legal authority” element of the animal cruelty offense the State alleged Volosen committed.  The following evidence is that most favorable to the verdict.  Ball testified that when he noticed Ginger was missing, he heard Volosen’s chickens clucking, but not squawking, and that they commonly make that noise.  He testified that he saw Ginger inside the chicken pen with the chickens but that Ginger was not chasing the chickens and had not injured or killed any chickens that day.  Ball testified, “I said, ‘Ginger, come,’ and the dog started to walk towards me, and it was kind of crouched down and looking up at [Volosen], and that’s whenever [Volosen] chopped down.  The dog probably took two steps, two or three steps.”  Ball never saw any feathers or blood on Ginger.  Mrs. Volosen testified that she never saw Ginger attacking animals on her property.  Although Mrs. Volosen testified that four chickens died after the incident on July 4th and claimed that their deaths resulted from the stress and trauma of the incident, there was no necropsy done on those chickens to determine the cause of death.  

Ball’s uncontroverted testimony that he heard the chickens clucking from over 150 feet away, that Ginger was inside Volosen’s chicken pen, and that the chickens fluttered from one side of the pen to the other begs the question, however; what else could Ginger have been doing in the chicken pen but “attacking” the chickens?  Ball testified that when he saw the chickens fluttering around, he “figured the dog was over there playing.”  On cross- examination, Ball testified,  

Q.  And these fowl that you say your dog was -- they weren’t wanting any part of that based on what you saw; correct?

A.  I’m not going to read the mind of a chicken, but they went to the opposite side, yes.

Q.  So [the chickens] didn’t appear as if they were playing with your dog, right?

A.  I guess not.

. . . .

Q.  Appeared disturbed?

A.  Could be.

Q.  Worried? 

A.  Probably.  They weren’t squawking.  They were making clucking sounds and going from one corner to the other.

Thus, Ball’s testimony shows that Ginger was making offensive or antagonistic movements at the chickens, satisfying the common meaning of the word “attack.”  
See
 
Webster’s Third New International Dictionary 
140.  Ball’s testimony also shows that Ginger was “chasing” the chickens—the chickens were flying from one side of the pen to the other to escape Ginger—thus satisfying the definition of “attack” applied by the
 Bueckner
 court.  
See Bueckner, 
886 S.W.2d at 372.

Viewing all the evidence in the light most favorable to the State, we cannot hold that a rational trier of fact could have found that Ginger did not attack Volosen’s chickens on the morning of July 4th immediately before Volosen struck and killed it with the maul.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Hampton
, 165 S.W.3d at 693.  Because Ginger “[was] attacking” or “[had] recently attacked” Volosen’s chickens on July 4th, Volosen was statutorily vested with legal authority to kill the dog.  
See
 Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033(a), 1989 Tex. Gen Laws 2230, 3142 (amended 2003).  No evidence exists that Volosen acted “without legal authority,” specifically without the legal authority conferred by former section 822.033(a), as required to sustain his conviction for animal cruelty under penal code section 49.02(a)(5).  We sustain his first point, reverse the trial court’s judgment, and render a judgment of acquittal.  
See
 
Tex. R. App. P.
 43.2(c), 51.2(d); 
Greene v. Massey
, 437 U.S. 19, 24-25, 98 S. Ct. 2151, 2154-55 (1978); 
Burks v. United States
, 437 U.S. 1, 16-18, 98 S. Ct. 2141, 2150-51 (1978).

V. Conclusion

Having sustained Volosen’s first point, we need not address his remaining points.
(footnote: 4)  We reverse the trial court’s judgment and render a judgment of acquittal.

SUE WALKER

JUSTICE

PANEL B: DAUPHINOT, WALKER, and MCCOY, JJ.

PUBLISH

DELIVERED: February 16, 2006

FOOTNOTES
1:
This statute was in effect when Volosen allegedly committed the offense, but the legislature later amended it, with minor substantive changes, and renumbered it.  
See
 Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 822.033, 1989 Tex. Gen. Laws 2230, 3142, amended by Act of May 22, 2003, 78st Leg., R.S., ch. 1002, § 1, sec. 822.033, 2003 Tex. Gen. Laws 2941, 2942 (codified as amended at 
Tex. Health & Safety Code Ann. 
§ 822.013 (Vernon Supp. 2005)).

2:
Tex. Penal Code Ann. 
§ 42.09(a)(5).

3:
However, Officer Walling testified at trial that the law does not require a dead animal in order to justify the killing of a dog.  

4:
See 
Tex. R. App. P.
 47.1.