In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-316 CR


____________________



BOBBY LEE KING, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the County Court at Law No. 1


Montgomery County, Texas


Trial Cause No. 03-191291






MEMORANDUM OPINION


 A jury convicted appellant, Bobby Lee King, of the misdemeanor offense of Deadly
Conduct. See Tex. Pen. Code Ann. § 22.05(a), (e) (Vernon 2003). The trial court assessed
King's punishment at confinement in the Montgomery County Jail for a period of ten days,
with confinement credited by time served. The trial court also assessed a fine in the amount
of $300, along with court costs. King raises three issues for our consideration. By his first
issue, King appears to argue the evidence is legally and factually insufficient to support his
conviction for deadly conduct and to reject his defense that he was justified in his actions
giving rise to the offense. Specifically, King argues the State failed to prove "the offense
was committed as indicted, per se with intent or knowingly[,]" and that the State produced
no evidence to controvert King's claims that his actions were justified under certain statutory
provisions "in order to prevent or suppress the commission of an offense." (1) 

 In reviewing a challenge to the legal sufficiency of the evidence, we examine the
evidence in the light most favorable to the verdict, and determine whether any rational trier
of fact could have found the essential elements of the offense proven beyond a reasonable
doubt. Jackson v. Virginia, 433 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Lane
v. State, 151 S.W.3d 188, 191-92 (Tex. Crim. App. 2004). Furthermore, our review
encompasses all the evidence, whether properly or improperly admitted. See Conner v. State,
67 S.W.3d 192, 197 (Tex. Crim. App. 2001). This standard leaves to the factfinder the
responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic to ultimate facts. See Hooper v. State, 214 S.W.3d 9, 13
(Tex. Crim. App. 2007). The factfinder is the sole judge of the credibility of the witnesses
and the weight to be given their testimony. Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon
1979). Thus, the factfinder is free to accept or reject any or all of a witness's testimony. See
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 

 Under a factual sufficiency determination, we review the evidence in a neutral light. 
Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App.), cert. denied, No. 07-5500, 2007
WL 2139364 (U.S. Oct. 1, 2007). "Evidence can be factually insufficient in one of two
ways: (1) when the evidence supporting the verdict is so weak that the verdict seems clearly
wrong and manifestly unjust, and (2) when the supporting evidence is outweighed by the
great weight and preponderance of the contrary evidence so as to render the verdict clearly
wrong and manifestly unjust." Id. (citing Watson v. State, 204 S.W.3d 404, 414-15 (Tex.
Crim. App. 2006); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). A reviewing
court may not reverse for factual insufficiency if "'the greater weight and preponderance of
the evidence actually favors conviction.'" Id. (quoting Watson, 204 S.W.3d at 417). While
a reviewing court may "second-guess the jury to a limited degree, the review should still be
deferential, with a high level of skepticism about the jury's verdict required before a reversal
can occur." Id. (citing Watson, 204 S.W.3d at 417; Cain v. State, 958 S.W.2d 404, 407, 410
(Tex. Crim. App. 1997)). 

 In reviewing a challenge to the legal and factual sufficiency of the evidence to support
a jury's rejection of a defense to prosecution, a reviewing court uses the same standards used
in reviewing the sufficiency of the evidence to support a verdict of guilt, looking at the
sufficiency of the evidence to support both the verdict as well as the rejection of the defense. 
See Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (factual sufficiency
standard); Saxton v. State, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (legal sufficiency
standard). Under the legal sufficiency standard, when a defendant raises a defense, as
opposed to an affirmative defense, the reviewing court determines whether, after viewing all
the evidence in the light most favorable to the prosecution, any rational trier of fact would
have found the essential elements of the charged offense beyond a reasonable doubt and also
would have found against the defendant on any defensive issue beyond a reasonable doubt. 
See Tex. Pen. Code Ann. § 2.03(d) (Vernon 2003); Adelman v. State, 828 S.W.2d 418, 421
(Tex. Crim. App. 1992); Saxton, 804 S.W.2d at 914. As for factual sufficiency of a rejected
defense, the reviewing court examines all the evidence in a neutral light and asks whether the
State's evidence taken alone is too weak to support the finding and whether the proof of
guilt, although adequate if taken alone, is against the great weight and preponderance of the
evidence. See Zuliani, 97 S.W.3d at 595. 

 Under either standard of review, when a defensive issue under section 2.03 is
contemplated, it is the defendant who bears the burden of producing some evidence that
supports the particular defense and, once accomplished, the State then bears the burden of
persuasion to disprove the raised defense. See Zuliani, 97 S.W.3d at 594-95; Saxton, 804
S.W.2d at 913-14. It is important to remember, however, that the State's burden of
persuasion "is not one that requires the production of evidence, rather it requires only that
the State prove its case beyond a reasonable doubt." Zuliani, 97 S.W.3d at 594 (citing
Saxton, 804 S.W.2d at 913). "When a jury finds the defendant guilty, there is an implicit
finding against the defensive theory." Id. (citing Saxton, 804 S.W.2d at 914).

 Under the proper appellate standard for a legal sufficiency review, we now set out the
record-evidence in the light most favorable to the verdict. The State's first witness was the
complainant, H.L. It was established that at the time of the offense, November 18, 2003,
H.L. was in a common-law relationship with H.T., the father of H.L.'s four-year old
daughter. That evening, H.L. and H.T. were returning to their home in Porter, Texas,
traveling south-bound on Highway 59. H.L. and H.T. were operating separate vehicles, each
having arrived at H.T.'s brother's home at separate times earlier in the day. H.L.'s daughter,
who was one and one-half years of age at the time, was riding in the back seat of H.L.'s
vehicle. H.L. had left her brother-in-law's home a few minutes before H.T. 

 H.L. continued south on the highway , and estimated her speed somewhere around 50
or 55 miles per hour. As she traveled down the highway in her green Ford Escort, H.L. was
suddenly "cut off and had to swerve into the shoulder." She described the other vehicle as
a champagne or tan-colored Suburban pulling a trailer. The driver of the Suburban was later
identified as the appellant, Bobby Lee King. H.L. had been traveling in the far right lane of
the two south-bound lanes when King's Suburban entered into her lane and cut her off. 
After having maneuvered onto the shoulder of the highway to avoid being hit, H.L. recovered
and flashed her lights at King's vehicle. H.L. did not speed up or attempt to catch King. 

 Unbeknownst to H.L., H.T. was approaching in his silver-colored vehicle and had
witnessed H.L.'s near miss with King's Suburban. H.T. proceeded to pass up both H.L. and
King, and then, in the grip of "road rage," H.T. either slammed on his brakes or swerved
unexpectedly in front of the Suburban, forcing King to brake quickly to avoid rear-ending
H.T. Because both H.T.'s vehicle and King's Suburban were quite a distance away from
H.L. at this time, her progress on the highway was not impeded. However, H.L. next
observed King imitate H.T. by passing H.T.'s vehicle and then cutting in front of or
slamming on his [King's] brakes. H.L. described the scene on the highway in this manner: 
"It seemed to me they went back and forth a couple of times. [H.T.] cut [King] off and then
[King] did it and then [H.T.] did it one more time and then they exited." 

 H.L. witnessed these actions up to the point King and H.T. exited Highway 59 at F.M.
1314. Moments later, H.L. exited Highway 59 at the same spot, and observed King and H.T.
turning left onto F.M. 1314 but was unable to follow them as she had to stop for a red traffic
light. Heading to her home, H.L. then proceeded to turn southbound onto Loop 494 and
approached the intersection of Loop 494 and Ford Road. As she approached the intersection,
she recognized King's Suburban in the left-turn lane on Loop 494 preparing to turn left onto
Ford Road. As H.L.'s light was green and King's left-turn signal was red, H.L. proceeded
through the intersection on her way toward East Martin Street, onto which she would turn
left. As H.L. continued on Loop 494, she saw what she believed to be King's Suburban
directly behind her vehicle. At the intersection of Loop 494 and East Martin there was a
flashing-red traffic signal. H.L. engaged her left-turn blinker, came to a stop, and as she
proceeded to make her left turn onto East Martin Street, King steered his Suburban and trailer
across the single northbound lane of Loop 494, across the grassy shoulder area adjacent to
the northbound lane of Loop 494, and positioned the Suburban and trailer across East Martin
so as to block H.L. from making the turn onto East Martin. 

 This maneuver by King scared H.L. and her first thought was to make a right turn into
the parking area of a convenience store located on the southbound side of Loop 494. H.L.
turned into the store's parking area with King's Suburban and trailer following closely
behind. The next thing H.L. became aware of was King standing next to the driver's-side
window of her vehicle with a handgun pointed directly at her and telling H.L. to either, "Get
the f * * * out of the car," or "Roll down your f * * * * * g window," and "Give me your f
* * * * * g license." H.L. did not recall King identifying himself at first while he pointed the
handgun at her. King may or may not have later told H.L. he was with the LaPorte Police
Department or showed her his badge. Eyewitnesses later testified that King was holding the
handgun with two hands and did not show H.L. a badge. H.L. described herself as being
"scared," "upset," and "in shock" at the time of the incident. Part of her emotional distress
was because she had her young daughter in the back seat at the time King pointed the
handgun at H.L. 

 The elements of the offense of deadly conduct are: (1) the defendant, (2) recklessly,
(3) engaged in conduct that placed the complainant in imminent danger of serious bodily
injury. Guzman v. State, 188 S.W.3d 185, 189 (Tex. Crim. App. 2006) (citing Tex. Pen.
Code Ann. § 22.05(a)). Additionally, under the statutory scheme, the element of
"recklessness" and the circumstance of "danger" in the third element "are presumed if the
actor knowingly pointed a firearm at or in the direction of another whether or not the actor
believed the firearm to be loaded." See Tex. Pen. Code Ann. § 22.05(c). Nevertheless, the
jury may, but is not required to, find the existence of "recklessness" and "danger" proven
even when these elements are established beyond a reasonable doubt. See Act of May 29,
1993, 73d Leg., R.S., ch. 900, § 1.01, sec. 2.05(2)(B), 1993 Tex. Gen. Laws 3586, 3591. (2)

 In the instant case, King testified in his defense and admitted to having knowingly
pointed a firearm at H.L. He further testified that as he did this, H.L. started yelling, and "I
can see she's starting to fall apart, having a hard time. She puts her hands up on the steering
wheel and tells me, I have a baby." But for King's proffer of certain defensive evidence, his
testimony alone would satisfy the appellate standards for us to find the evidence to be both
legally and factually sufficient to sustain his conviction. See Lane, 151 S.W.3d at 191-92;
Roberts, 220 S.W.3d at 524.

 However, in an attempt to provide a legal justification for his actions, King presented
evidence that he was a licensed peace officer with "20 plus years" of experience, who was
employed with the City of LaPorte Police Department at the time of the offense, and,
although he was not on duty at the time nor acting within his general jurisdictional
boundaries, he was nevertheless entitled to point his handgun at H.L. based on the facts and
circumstances as he perceived them. King testified to the fact that at the time he confronted
H.L. with his handgun, he was "[s]cared to death," and was afraid that both he and his wife
were about to be killed. Yet, King's description of the circumstances as he perceived them
lack specificity. We reproduce a pertinent portion of his direct-examination testimony as he
describes the events directly leading up to the offense against H.L.: 

 Q.[King's counsel] And then what do you do?


 A.[King] At this time, we start picking up speed again. We're going home. 
This incident is over. It's finished.


 Q. Okay.


 A. At that time the [H.L.] vehicle came back into the picture.


 . . . .


 Q. What does the vehicle do?


 A. Okay. The vehicle is passing.


 Q. On which side?


 A. On the left side. This is the first time I remember seeing the vehicle the
second time whenever it was right here.


 Q. It was right on your - - over your left shoulder?


 A. Yes, sir. 


 Q. What happened?


 A. It was in the northbound lane [of Loop 494]. 


 . . . .


 A. As it comes around me, my wife tells me at that time, that's that other car. 
And, I said, what other car? She said, the other car out on the highway. I said,
you don't know that. She said, yes, I do, that's her, that's the same girl.


 Q. Is that car still just to your left?


 A. No, it's moving on around. 


 Q. Okay. Go ahead.


 A. Not passing me real fast, but she is passing, she's doing well.


 Q. [sic] Okay. Okay. My wife identifies this vehicle as the other vehicle that
was out on the roadway with the [H.T.] vehicle.


 Q. Okay.


 A. She comes around me, and as she comes around me - - as soon as she gets
straight, she slams on her brakes. 


 Q. Okay. What do you do at that moment?


 A. At that time, I'm back on my brakes again.


 Q. What are you thinking at this point?


 A. Trying to keep her - - trying to keep my vehicle from hitting her's, and I'm
still expecting my [motorcycle] to come through the back of the Suburban.


 Q. What are you thinking, in terms of danger?


 A. At that time I believe I am being set up for something. [H.T.'s] vehicle has
just left me, now this vehicle comes back into the picture again. Not only has
she slammed on her brakes, but now she's traveling at 15 miles an hour.


 Q. All right.


 A. I tell my wife I can run faster than this.


 Q. All right. Talk to them.


 A. Yes. I tell my wife I can run faster than this. At that time, I reach into my
console and pull my weapon out. 


 Q. Why do you think you're being - - what does that mean when you say I
think I am being set up at that point?


 A. I felt for sure I was being set up at that point for something.


 Q. By who?


 A. What, I don't know. Between the [H.T.] vehicle and this one. Being set
up for what? At that time I didn't know. I didn't even really try to search
through my mind to try to figure out what was going on, other than I knew I
was being set up for something. This vehicle traveling 15 miles an hour gives
the [H.T.] vehicle enough time, he knows the area, I don't, possibility for him
to jump up in front of her and catch me in a bad way further on down the
roadway. As I stated before, at that time I took my weapon out of the console,
stuck it up underneath my leg so that I'm at ready. I instruct my wife, I don't
know what is going to happen, you've got your seat belt on, stay there. I don't
care what happens, stay in the vehicle, do not get out of the vehicle for any
reason. You stay right there.


 Q. Is that police training also?


 A. Yes.


 Q. All right. Go ahead. What next?


 A. She acknowledged she understood that. At that time we were coming up
on the other intersection.


 Q. That would be East Martin?


 A. This intersection.


 Q. Okay. East Martin intersection?


 A. Yes, sir.


 Q. You're coming up on that intersection and what do you do?


 . . . .


 A. Yes. 


 We're coming up on - - we're coming up on this intersection and the
lady [H.L.], the person driving the vehicle, activated her left turn signal. 
We're running on 15 miles an hour and all of a sudden we're going to turn into
a perfect driver and activate her left turn signal.


 Q. What did that tell you?


 A. That told me she was about to turn down this road.


 Q. Now, where is it that [H.T.] went?


 A. He went down Ford Road.


 Q. Did he go left or did he go right?


 A. He went left.


 Q. And now she's going to go this direction?


 A. Right. She's coming down here and she's going to make a left turn here.


 Q. So both of them would have been going left?


 A. Yes. Now - - 


 Q. At that point, in order for you to do something, you would have had to have
turned left again?


 A. Sure.


 Q. And you didn't want to do that, did you?


 A. No, sir. 


 Q. Why didn't you want to turn left?


 A. Well, to follow them?


 Q. What is over the railroad track?


 A. Darkness. But the thought of following them - - at that time I knew I was
being set up for something and I wanted to stop it. I wanted it to all stop.


 . . . .


 So as we approach this intersection, she activates her left turn signal. 
And I don't want her going down this road, because I don't know if the [H.T.]
vehicle or another one, still another one, would come back up somewhere later
on.


 Q. Right. So what do you do?


 A. And I'm tired of this already. So I pulled my vehicle across the corner and
blocked her escape.


 Q. Did you go behind the pole?


 A. No, sir, couldn't go behind the pole.


 . . . .


 Q. How come you didn't go behind the pole?


 A. Well, I've got a $42,000 Suburban, $32,000 [motorcycle] behind me. 


 . . . .


 As I cut the [H.L.] vehicle off here with my Suburban and trailer - - 


 Q. Are you concerned for your safety at that point?


 A. At that point, I'm scared to death for mine, but even more so for my wife.


 Q. To what degree? Are you afraid they are going to hijack you, kill you;
what are you afraid of?


 A. Basically afraid of the unknown. I don't know what is coming next.


 Q. Was that reasonable, in your opinion?


 A. It is to me as a police officer, yes, sir, very reasonable.


 Q. Even today?


 A. Yes, sir, yes, sir. 


 Q. All right. Go ahead.


 A. Everything here worked out luckily in my favor. Because whenever I
pulled in across here, the [H.L.] vehicle simply made a half moon and pulled
directly in to the convenience store.


 Q. Is that what you wanted her to do?


 A. Yes, sir. And as she did that, I pulled directly in behind her here. Actually,
the end of my trailer was sitting on the shoulder of the road out here.


 . . . .


 Q. All right. When I say "at that time," at the point where you were blocking
East Martin, did you see a white van?


 A. There were no other vehicles at that time.


 . . . .


 Q. So you pulled in right behind her?


 A. Yes, sir. She came to a stop, I came to a stop immediately and did not wait
on anything. I bailed out of my vehicle out of fear.


 Q. Okay. 


 A. I had my badge in my left hand.


 Q. What were you afraid of?


 A. The unknown. I was expecting the other vehicle or other vehicles to come
back into the picture. 


 Q. All right.


 A. As far as I knew right then, I was still being set up and I was stopping
everything right there. 


 Q. How would you describe your emotions?


 A. Scared to death. 


 . . . .


 Anyway, I bailed out of my vehicle, my badge in my left hand, gun in
my right. The same badge I showed the jury a minute ago. 


 Q. What type of weapon did you pull?


 A. Para-Ordinance P-14, .45 automatic.


 Q. How big is it?


 A. Very large gun.


 Q. If you put your hand up, is it bigger than your hand?


 A. Very much so. It's one of the larger weapons that's made. I have got a
pretty good sized grip. I'm able to handle it. 


 . . . .


 Q. (By [King's counsel]) So what happens next?


 A. I start yelling out loudly, very loudly.


 . . . .


 Q. Do you even know if this is a male or a female?


 A. At that time, I don't. The idea of male/female doesn't even come into the
picture, basically, because we've been trained time and time again females or
males will kill a cop. Makes no difference. 


 . . . .


 At that time, the white van - - I caught a glimpse of this white van
moving very slowly on the other side of her vehicle. It was over on the
roadway approaching the convenience - - 


 Q. To her right or to her left?


 A. It would have been to her right. 


 . . . .


 And at the time I did not know the white van was not part of the set up.


 Q. Because of the speed?


 A. The van was moving extremely slowly. I remember a male subject
watching me. At that time, I still had my badge up; my gun was at ready.


 Q. Is your finger on the trigger?


 A. I was indexed.


 Q. What does that mean?


 A. My finger was laying alongside the trigger guard to the left. It was not on
the trigger.


 Q. Why is that significant?


 A. This is training. This is what we do.


 Q. And why are you trained that way?


 A. This particular method is used so that we know we don't put our finger on
the trigger until you are ready to engage. At that time I was prepared, but not
ready to engage.


 . . . .


 Q. And this is called what? What is this called? Indexing?


 A. Yes, yes.


 Q. That's in an effort to notify who?


 A. Well, automatically she's on notification. She already looks up an [sic]
sees the gun.


 Q. Now, what - - how does she know that? Does she turn her head?


 A. Yes, she turned around, yeah, and she actually looks and I have - - she's
looking at me. I have a badge here, I have a weapon here, and I'm yelling,
police officer, police officer, show me your hands and put your hands on the
steering wheel.


 . . . .


 I - - I drop my stance, very small amount, to look into the back seat and
make sure the back seat is clear, and I can see there is a child in the back seat.


 Q. Okay. What do you do?


 A. At that time I tell her I need to see some driver's license. I want to know
who I am talking to. At that time, I took about a half a step back.


 Q. Why do you do that?


 A. The threat has diminished very slightly at that point. 


 Q. All right. You step back at that point and what do you do?


 A. I holster my weapon. I see she's not got a weapon there. But the weapon
is not locked in, I'm still prepared. I'm still looking around expecting, at least,
one other vehicle to come in to assist her. 


 Q. Are you still concerned for your life?


 A. I'm still scared to death. I'm trying to watch her, look for another vehicle,
watch the white van and make sure nobody is getting to my wife. 


 . . . .


 Q. Okay. Go ahead.


 A. At that time I have got to decide - - find out where I'm at, because I still
don't know where I'm at. Watching her I am looking around, watching her,
watching the van, watching the wife, looking for different vehicles and trying
to find signs, something to tell me where I am at so I can make a phone call,
get law enforcement officers out there. Out of the corner of my eye, I cast a
reserve officer, which I did not know he was there at the time. He was
standing out behind me. He was on the telephone. 


 Q. What did you do?


 A. I yelled at him and asked him, are you on the telephone to the police
department. He advised me, yes, and I said, good.


 Q. Did you identify yourself to him?


 A. Yes. 


 . . . .


 Q. (By [King's counsel]) Then what happens?


 A. I held the scene. [H.L.] advised me she wanted her driver's license back. 
I told her, no, the other officer would give it to her. I held on to them until the
other officers got there. 


 Q. When you approached her vehicle with your gun drawn, was your intention
to arrest her?


 A. At that time it was a detention, fine line between arrest and detention, yes,
sir.


 Q. She was in custody for - - 


 A. She was in custody for investigation purposes at that time. 


 Q. All right. And you were out of your jurisdiction?


 A. Yes.


 Q. What is one of the responsibilities you have that the code provides for off-duty officers who are out of their jurisdiction? What is the thing they have to
do?


 A. We have to get law enforcement officers with jurisdiction in that area on
the scene and the scene is turned over to those officers.


 Q. Would you consider her conduct that evening to have been a breach of the
peace?


 A. Oh, yes.


 Q. Would you have considered her conduct to be reckless driving?


 A. Yes. 


 The State did not contest the fact that King was a licensed peace officer nor that he
was employed with the City of LaPorte Police Department. The State's evidence did focus,
however, on the element of recklessness in King's actions on the evening in question and on
establishing the fact that a reasonable peace officer presented with similar facts and
circumstances would not have acted as King did while not on duty and outside his
jurisdiction, while in his personal vehicle with his family, and when not faced with imminent
serious bodily injury or death. King's direct examination testimony that H.L. had engaged
in reckless driving and a breach of the peace was impeached during cross-examination by use
of his hand-written statement completed on the evening in question in which King fails to
mention his encounter with H.L. beginning on Loop 494 as described in his testimony quoted
above.

 Paragraphs three and four of the jury charge contain the defensive instructions. King
does not complain of these instructions on appeal. The defensive instructions appear in the
record as follows: 

III.



 "Deadly force" means force that is intended or known by the actor to
cause, or in the manner of its use or intended use is capable of causing, death
or serious bodily injury. [See Tex. Pen. Code Ann. § 9.01(3) (Vernon 2003).]


 It is the duty of every peace officer to preserve the peace within the
officer's jurisdiction. To effect this purpose, the officer shall use all lawful
means. [See Tex. Code Crim. Proc. Ann. art. 2.13(a) (Vernon 2005).]


 A peace officer who is outside his jurisdiction may arrest, without
warrant, a person who commits an offense within the officer's presence or
view, if the offense is a felony, or a breach of the peace. A peace officer
making an arrest shall, as soon as practicable after making the arrest, notify a
law enforcement agency having jurisdiction where the arrest was made. [See
Tex. Code Crim. Proc. Ann. art. 14.03(d) (Vernon 2005).]


IV.



 The threat of force is justified when the use of force is justified. A
threat to cause death or serious bodily injury by the production of a weapon or
otherwise, as long as the actor's purpose is limited to creating an apprehension
that he will use deadly force if necessary, does not constitute the use of deadly
force; if: [See Tex. Pen. Code Ann. § 9.04 (Vernon 2003).]

 1. A peace officer is justified in using force against another when and
to the degree the actor reasonably believes the force is immediately necessary
to make or assist in making an arrest if the actor reasonably believes the arrest
or search is lawful, and before using force, the actor manifests his purpose to
arrest or search and identifies himself as a peace officer or as one acting at a
peace officer's direction, unless he reasonably believes his purpose and
identity are already known by or cannot reasonably be made known to the
person to be arrested, AND, [See Tex. Pen. Code Ann. § 9.51(a)(1), (2)
(Vernon 2003).]

 2. A peace officer is justified in using deadly force against another
when and to the degree the peace officer reasonably believes the deadly force
is immediately necessary to make an arrest. Use of deadly force is justified
when the actor reasonably believes the conduct for which arrest is authorized
included the use or attempted use of deadly force; or the actor reasonably
believes there is a substantial risk that the person to be arrested will cause
death or serious bodily injury to the actor or another if the arrest is delayed. 
[See Tex. Pen. Code Ann. § 9.51(c)(1), (2), . . . .]


 If you believe the Defendant's use or attempted use of force or deadly
force was justified or, if you have a reasonable doubt thereof, you will find the
Defendant not guilty. [See Tex. Pen. Code Ann. § 9.02 (Vernon 2003).]


 In the instant case, the jury as trier-of-fact, by finding King guilty, implicitly rejected
all of his defenses. See Adelman, 828 S.W.2d at 422; Saxton, 804 S.W.2d at 914. King
produced evidence admitting to the offense but also attempted to demonstrate that his actions
in committing the offense were legally justified. See Tex. Pen. Code Ann. § 9.02. The jury
could have rationally concluded that under the circumstances he was not acting as a peace
officer "to preserve the peace." See Tex. Code Crim. Proc. Ann. art. 2.13(a). (3) The
remaining defensive instructions required the jury to find, among other things, that King's
use of force against H.L. was justified because King's subjective beliefs of the facts and
circumstances he was perceiving at the time were "reasonable." 

 A reasonable belief is one that would be held by an ordinary and prudent person in the
same circumstances as the actor. Tex. Pen. Code Ann. § 1.07(a)(42) (Vernon Supp. 2006). 
Generally, whether a defendant was prompted to act by a reasonable belief is a question for
the trier of fact. See Sanders v. State, 707 S.W.2d 78, 79-80 (Tex. Crim. App. 1986), limited
on other grounds, Willis v. State, 790 S.W.2d 307, 314 (Tex. Crim. App. 1990)(en banc). 
In the instant case, King produced very little evidence for the jury as to any immediate threat
to him or his wife posed by H.L. necessitating King's pulling his handgun and pointing it
directly at H.L. By his own testimony, King's only problem with H.L. stemmed from the
purported brakes-slamming incident on Loop 494 just prior to H.L.'s attempted left turn onto
East Martin. King's testimony on this point was seriously undermined by the testimony of
Cassidy and Thomas Mishler, the occupants of the white van who were eyewitnesses to the
events in question, and who testified that their van was between King's vehicle and H.L.'s
vehicle at the time King swerved his Suburban across Loop 494 and onto East Martin to
prevent H.L. from turning left onto East Martin. However, the most striking detail to which
neither King nor any of his witnesses provided an adequate explanation was why King did
not simply break off the encounter previously while still on Highway 59 as he and his wife
were returning home to LaPorte. The evidence establishes that it was King who pursued both
H.T. and H.L., and that King had the ability to forgo either pursuit at his discretion. It has
been observed that the availability of legal alternatives may be relevant when analyzing the
reasonableness of an actor's conduct. See Pennington v. State, 54 S.W.3d 852, 859 (Tex.
App.--Fort Worth 2001, pet. ref'd); see also Arnwine v. State, 20 S.W.3d 155, 160 (Tex.
App.--Texarkana 2000, no pet.) (citing Smith v. State, 874 S.W.2d 269, 273 (Tex. App.--Houston [14th Dist.] 1994, pet. ref'd), abrogated on other grounds by Clewis v. State, 922
S.W.2d 126, 129 n.1 (Tex. Crim. App. 1996). Based upon all of the facts and circumstances
presented during the trial, there is both legally and factually sufficient evidence in the record
to support a rational jury in concluding King's conduct on the evening in question was not
reasonable, thereby rejecting each of King's defensive issues.

 Therefore, viewing all the evidence in the light most favorable to the prosecution, a
rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt and could have found against King on all his defensive issues beyond a
reasonable doubt. Examining all the evidence in a neutral light, we find the State's evidence,
taken alone, is neither too weak to support the jury's guilty verdict and rejection of King's
defensive issues, nor is the State's proof of King's guilt against the great weight and
preponderance of the evidence. We overrule King's first issue. (4) 

 King's second issue is multifarious in complaining of the admissibility of deposition
testimony from two State's witnesses, and complaining that certain cross-examination
testimony of these same witnesses was erroneously excluded by the trial court. King initially
contends that there was no statutory provision for taking depositions to preserve testimony
in a criminal case, and that the State failed to make a good-faith effort to otherwise secure
the deposed witnesses for trial. King does not direct our attention to the place in the record
where these particular complaints were raised before the trial court. See Tex. R. App. P.
33.1(a)(1); Tex. R. Evid. 103(a)(1). Indeed, the State correctly points out that the record
reflects King was unopposed to the State's pretrial motion to depose the Mishlers. As such,
King has failed to preserve this part of issue two for appellate review. See Tex. R. App. P.
33.1(a)(1).

 In the second part of issue two, King complains that his constitutional rights to
effective representation, to confrontation, and to present a defense were violated by the trial
court's "refusing to allow the follow-up questions and answers of defense counsel to be
admitted before the jury." The witnesses in question were Thomas David Mishler and
Cassidy Mishler. The Mishlers, husband and wife, were traveling in the white van on Loop
494 when the instant offense occurred, and witnessed certain events involving King and H.L. 
At the time of trial, the Mishlers had relocated to the State of Alaska, and did not plan to
return to Texas. 

 We review a trial court's ruling admitting or excluding evidence under an abuse of
discretion standard. See Martin v. State, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). The
ruling must be upheld if it was correct under any theory of law applicable to the case in light
of what was before the trial court at the time the ruling was made. Id. Our examination of
the excluded cross-examination responses indicate King was most often attempting to elicit
opinions from the Mishlers, either based upon hypothetical fact questions or on questions that
mixed law and fact. King contends the trial court's error denied the jury the opportunity to
hear the complete testimony from the Mishlers, thereby leaving the jury with "a false
impression that the witnesses believed Officer King acted improperly, and denied
defendant's right to effective presentation of his defense." 

 The record indicates that King began cross-examination of both Thomas and Cassidy
by establishing that neither of them had any training or education in law enforcement. From
all indications, the State sought the Mishlers' testimony solely as lay witnesses who happened
to have observed the events in question. In Osbourn v. State, 92 S.W.3d 531 (Tex. Crim.
App. 2002), the Court explained the scope of "opinion" testimony in the following manner:

 Both lay and expert witnesses can offer opinion testimony. Rule 701
covers the more traditional witness -- one who "witnessed" or participated in
the events about which he or she is testifying -- while Rule 702 allows for a
witness who was brought in as an expert to testify. A witness can testify in the
form of an opinion under Rule 701 if the opinions or inferences are (a)
rationally based on his or her perceptions and (b) helpful to the clear
understanding of the testimony or the determination of a fact in issue. Fairow
v. State, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). Perceptions refer to a
witness's interpretation of information acquired through his or her own senses
or experiences at the time of the event (i.e., things the witness saw, heard,
smelled, touched, felt, or tasted). Since Rule 701 requires the testimony to be
based on the witness's perception, it is necessary that the witness personally
observed or experienced the events about which he or she is testifying. Id. at
898. Thus, the witness's testimony can include opinions, beliefs, or inferences
as long as they are drawn from his or her own experiences or observations. 
This also incorporates the personal knowledge requirement of Rule 602 which
states that a witness may not testify to a matter unless he or she has personal
knowledge of the matter. Bigby v. State, 892 S.W.2d 864, 889 (Tex. Crim.
App. 1994). There is, however, a provision in Rule 602 for opinion testimony
by expert witnesses which allows a person testifying as an expert under Rule
702 to base his or her opinion on facts and data that are of a type reasonably
relied upon by experts in the field. Tex. R. Crim. Evid. 703. Thus, expert
testimony serves the purpose of allowing certain types of relevant, helpful
testimony by a witness who does not possess personal knowledge of the events
about which he or she is testifying.


Id. at 535-36 (footnote omitted). Because the Mishlers were lay witnesses, any opinion
testimony from them had to be rationally based on their own experiences or senses and had
to aid in the understanding of their testimony or in the determination of a fact in issue. 
According to King, the excluded testimony was highly pertinent to his justification defense
related to his purported duty as a peace officer. Of course, a defendant's meaningful right
to present a complete defense is not unlimited. "A defendant has a fundamental right to
present evidence of a defense as long as the evidence is relevant and is not excluded by an
established evidentiary rule." Miller v. State, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001)
(citing Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). 
 To be relevant, evidence must fulfill two conditions: first, materiality, and second,
probativeness. Miller, 36 S.W.3d at 507. As the Miller Court explained:

 For evidence to be material it "must be shown to be addressed to the proof of
a material proposition, i.e., 'any fact that is of consequence to the
determination of the action.' 'If the evidence is offered to help prove a
proposition which is not a matter in issue, the evidence is immaterial.'" 1
STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS
RULES OF EVIDENCE: CIVIL AND CRIMINAL § 401.1 (2d ed. 1993 &
Supp. 1995). If the proponent establishes that the proffered evidence is
material, Rule 401 also requires that the proponent establish the evidence is
probative, i.e., the proffered evidence must tend to make the existence of the
fact "more or less probable than it would be without the evidence." Id. The
proffered evidence is relevant if it has been shown to be material to a fact in
issue and if it makes that fact more probable than it would be without the
evidence.


Id. 

 In the instant case, King had already established the fact that neither of the Mishlers
had any law enforcement training or education. Therefore, any questions attempting to elicit
their opinions on King's duty or authority as a peace officer, whether off-duty and/or outside
his jurisdiction, failed to meet the requirements of Rule 701 (personal perception or
knowledge) and of Rule 401 (relevance requiring both materiality and probativeness). 
Additionally, the hypothetical questions formulated by King's trial counsel had little, if any,
evidentiary basis. See Pyles v. State, 755 S.W.2d 98, 118 (Tex. Crim. App. 1988) ("The
assumptions of the hypothetical must be based on facts within the personal knowledge of the
witness, or facts assumed from common or judicial knowledge, or facts supported by 
evidence.") Because the excluded questions and answers were neither relevant nor
representative of the witnesses' personal perception or knowledge, there was no abuse of
discretion on the trial court's part in excluding them from the jury's consideration. Issue two
is overruled. 

 King's last issue again presents a multifarious complaint; error by the trial court in
"allow[ing]" an inmate in jail-clothing to abruptly appear in the courtroom in the presence
of the jury, and in permitting the State to admit King's book-in photograph. The record
indicates that early in the trial during the direct testimony of H.L., an inmate appears to have
wandered into the courtroom, with the trial judge seemingly as surprised as anyone, as is
indicated by the following portion of the record: 

 Q.(By [The State]) When you turned in down to the store, what did the
defendant do?


 A.[H.L.] He pulled in the store - - 


 THE COURT: Excuse me, ma'am. 


 Mr. Webb, can I get you to escort the prisoner outside.


 Ladies and gentlemen, that has nothing to do with this case. It is a
completely different case. I have to see him today. He was arrested because
he didn't pay fines and court cost in another case. It has nothing to do with
this case. But he has to be brought over immediately upon his arrest. So that's
why he's here. I just want y'all to know that. Thank you.


 [The State]: May I proceed, Your Honor?


 THE COURT: You may.


 As the record indicates, the trial court immediately explained to the jury that the
inmate's sudden presence in the courtroom was absolutely unrelated to King's prosecution. 
Additionally, King made no objection with regard to this incident. Thus, he has failed to
preserve this issue for review. Tex. R. App. P. 33.1(a). Additionally, we find the trial court's
sua sponte explanation to function as an instruction to disregard. See Archie v. State, 221
S.W.3d 695, 698 (Tex. Crim. App. 2007). The inmate's inopportune appearance was
harmless to King's substantial rights. See Tex. R. App. P. 44.2(b). This part of issue three
is overruled.

 With regard to the book-in photograph, the record indicates that during her deposition,
Cassidy Mishler used a photograph of King provided by the State to identify him as the
perpetrator of the acts she witnessed on the evening in question. It is not clear from the
record that the photograph Cassidy used to identify King is the same photograph as is State's
Exhibit 7, the book-in photograph admitted at trial. King had no objection to the photograph
used by Cassidy during her deposition. At trial, King objected to State's Exhibit 7 on the
grounds that King has "an angry look on his face. . . . This picture doesn't do anything but
aggravate the circumstances. It has no probative value." The trial court apparently
determined that, because Cassidy identified King by his photograph, State's Exhibit 7 was
admissible. 

 We will construe King's objection to be that the photograph lacked relevance and that
its probative value was substantially outweighed by unfair prejudice. See Tex. R. Evid. 401,
403. King did not object at trial to, nor does he now complain of, an improperly suggestive
photographic identification procedure by the State. See Barley v. State, 906 S.W.2d 27, 33-34 (Tex. Crim. App. 1995). Admissibility of a photograph is within the sound discretion of
the trial court. See Paredes v. State, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004). The
deposition testimony was taken out of King's presence thus necessitating the use of his
photograph so that proper identification of the perpetrator by the Mishlers could be
established. Therefore, State's Exhibit 7 was relevant as identity is an essential element in
any criminal offense. As the State points out, Rule 403 favors the admission of relevant
evidence and carries a presumption that relevant evidence will be more probative than
prejudicial. See Shuffield v. State, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). In the
instant case, the basis of the objection -- that King had an "angry look" -- is highly
subjective. The photograph is not prejudicial in the traditional sense as it contains no
markings and does not present King in any jail clothing or holding an identification slate with
his name and inmate number, nor does it indicate it was obtained from a prior offense. See
Hollis v. State, 219 S.W.3d 446, 466 (Tex. App.--Austin 2007, no pet.). That the photograph
is unflattering to King is not the issue; it must be unfairly prejudicial to him, i.e., evidence
that has a "'tendency to suggest decision on an improper basis, commonly, though not
necessarily, an emotional one.'" See Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Crim.
App. 1990) (opinion on rehearing)(quoting Advisory Committee's Note to Fed R. Evid.
403). In the instant case, we find the trial court's ruling on King's photograph to be well
"within the zone of reasonable disagreement." Id. at 391. It was not error to admit State's
Exhibit 7. Id. King's third issue is overruled. The judgment of the trial court is affirmed. 
 AFFIRMED.

 __________________________________

 CHARLES KREGER

 Justice

Submitted on April 17, 2007

Opinion Delivered October 31, 2007

Do not publish


Before Gaultney, Kreger, and Horton, JJ.
1. King also appears to argue that his actions were justified under a theory of self-defense pursuant to Tex. Pen. Code Ann. § 9.32 (Vernon 2003). However, the jury was
not given such a defensive instruction and we find no indication in the record where King
made such a request. Therefore, our opinion focuses only on the defensive issues
provided to the jury and properly argued by King on appeal. Tex. R. App. P. 33.1(a). 
2. Current version at Tex. Pen. Code Ann. § 2.05(a)(2)(B) (Vernon Supp. 2006). 
The trial court in the instant case properly instructed the jury under section 2.05 thereby
avoiding a "mandatory presumption" issue. See Brown v. State, 122 S.W.3d 794, 799
n.17 (Tex. Crim. App. 2003); see also Guzman v. State, 188 S.W.3d 185, 193 (Tex. Crim.
App. 2006) (Statutory presumption is not an element of an offense because it is not part
of the statutory definition of the crime.). 
3. Additionally, at the time the offense took place, November 18, 2003, the Texas
Code of Criminal Procedure authorized only peace officers who were Texas Rangers and
Troopers with the Texas Department of Public Safety to make extra-territorial arrests for
violations of the "Rules of the Road" set out in the Texas Transportation Code. See State
v. Kurtz, 152 S.W.3d 72, 77 (Tex. Crim. App. 2004). The offense of "Reckless Driving"
is a violation of the "Rules of the Road." See Tex. Transp. Code Ann. § 545.401
(Vernon 1999). Section 545.401 is part of subchapter I, which is titled "Rules of the
Road;" subchapter I is part of Title 7, titled "Vehicles and Traffic." As King was outside
his jurisdiction at the time he encountered H.L., he had no authority to effectuate a
detention of H.L. even if she had committed the offense of "reckless driving" in King's
presence. See Kurtz, 152 S.W.3d at 79-80. 
4. King urges that we examine his defensive issues in light of the analysis
conducted by the court of appeals in Volosen v. State, 192 S.W.3d 597 (Tex. App.--Fort
Worth 2006, pet. granted). The Court of Criminal Appeals reversed the court of appeals'
decision, finding that the defendant had failed in his burden of production to demonstrate
the statutory defense upon which he relied was applicable in Tarrant County at the time of
his trial. See Volosen v. State, 227 S.W.3d 77, 81-82 (Tex. Crim. App. 2007). At the
time King filed his appellate brief, he did not have the benefit of this review of Volosen
by the Court of Criminal Appeals.